# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPENCER ALEC SCARBER,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>KEN CLARK,<br><br>　　　　　Respondent. | Case No. 1:21-cv-00880-AWI-SAB-HC<br><br>FINDINGS AND RECOMMENDATION RECOMMENDING DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS |

Petitioner, represented by counsel, is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## I.

## BACKGROUND

On December 14, 2012, Petitioner was convicted after a jury trial in the Fresno County Superior Court of forcible rape (count one), forcible sexual penetration (count two), first-degree burglary in which a non-accomplice was present in the residence (count four), and first-degree residential burglary (count five). (2 CT[1] 385–95.) Petitioner was sentenced to an imprisonment term of twenty-five years to life plus ten years. (4 CT 1005–08.) On November 13, 2019, the California Court of Appeal, Fifth Appellate District affirmed the judgment. People v. Scarber, No. F068908, 2019 WL 5958004 (Cal. Ct. App. Nov. 13, 2019). On March 11, 2020, the California Supreme Court denied Petitioner's petition for review. (LDs[2] 11, 12.)

---

[1] "CT" refers to the Clerk's Transcript on Appeal lodged by Respondent. (ECF No. 18.)
[2] "LD" refers to the documents lodged by Respondent. (ECF No. 18.)

On June 2, 2021, Petitioner filed the instant federal petition for writ of habeas corpus and a memorandum in support of the petition. (ECF Nos. 1, 3.) Therein, Petitioner raises the following claims for relief: (1) prosecutorial conflict of interest; (2) erroneous admission of involuntary statements; and (3) ineffective assistance of counsel. Respondent filed an answer, and Petitioner filed a traverse. (ECF Nos. 17, 20.)

## II.

## STATEMENT OF FACTS[3]

### A.  Facts of the Offense

In July 2011, Y.G. worked as a housekeeper at Ronnie S.'s home in Squaw Valley.[4] On Friday, July 29, Y.G. arrived at 11:00 a.m. She had been there a little over half an hour and was vacuuming the bathroom with her back to the doorway, when someone bumped into her and put his arms around her. When she started screaming, he put his hand over her mouth. She struggled to break away, but he told her to stop fighting him and he pulled out a knife and put it to her throat. Fearing for her life, she submitted.

The man let her go, and she turned around. Her assailant's face was covered with what looked like a T-shirt or some kind of material, and he was wearing large dark glasses. He told Y.G. to turn off the vacuum. He still had the knife, and she complied. He then told her to go over to the bed and get naked. She resisted a couple of times, but he threatened her by bringing the knife closer to her each time. Eventually, she got undressed. He noticed a cell phone in her pocket, took it from her, and set it on the bed.

Once Y.G. was naked, the man told her to lie on the bed. She complied. He then put one or more fingers in her vagina and another finger or fingers in her anus. After he did this, he tried to penetrate her vagina with his penis. He was having problems inserting it and seemed frustrated. Eventually, he achieved penetration.

At some point, Y.G. saw the knife and her phone lying next to her on the bed. She reached for them, but the man noticed, grabbed them and moved them away, and then pinned her hands above her head. When he finished raping her, he took the knife and her cell phone and rushed to the door. As he was leaving, he said, "Next time you come back," and he mumbled something else. Because she came to the house on a regular basis, Y.G. felt he was someone who knew something about her.

Once the man left the room, Y.G. put some of her clothes back on, then went to the bedroom of Brittany C. to see if she had a phone. When Brittany opened the bedroom door, Y.G. told her what had happened. Brittany checked on her elderly grandfather, then called 911.

---

[3] The Court relies on the California Court of Appeal's November 13, 2019 opinion for this summary of the facts of the offense and procedural history. See Vasquez v. Kirkland, 572 F.3d 1029, 1031 n.1 (9th Cir. 2009).

[4] Pursuant to California Rules of Court, rule 8.90, certain persons will be referred to by their first name or initials. No disrespect is intended. Undesignated dates in the statement of facts are to the year 2011.

When medical and law enforcement personnel arrived, Y.G. was visibly shaking and crying. She described her assailant as tall and skinny, with buzzed brown or dark hair, and with a dark-colored T-shirt or something covering his face up to his eyes and glasses. Y.G. had no idea who he was. She later learned defendant had been accused of committing the rape. She had never heard his name or seen him before.[5]

Ronnie came home as soon as Brittany notified her of the rape. Ronnie gave the police several names of young men she thought could fit the perpetrator's description. All were former friends of her son, Thomas S. The first person who came to her mind was defendant. She described him to deputies as tall and slender, with medium-brown hair in a buzz cut. Late that afternoon or early evening, a white car drove back and forth past the house. Ronnie notified the police, because it seemed suspicious and she thought it might be the perpetrator. Thomas said it was defendant in his mother's car.

The S. home had a driveway that was about the length of a football field. An inoperable Ford Explorer sat near the midpoint. Late on the evening of the incident, Ronnie heard a lot of young people out there. Someone said defendant was there and had confessed.

Ronnie recalled walking down to the car with Brittany and Brittany's husband, Jaron C. At least two females and several males, all teenagers or young adults, were at the vehicle. Defendant was also there. Ronnie asked him why he would rape Y.G. He said he did not know why. Other people were also asking him questions.[6] When Ronnie asked defendant where Y.G.'s cell phone was, defendant responded that he might have thrown it in the field or he might have thrown it down the road.

During this time, defendant was sitting in the car. Ronnie could clearly see his face. He was not injured in any way. He appeared to be high on something, but he was coherent and knew what he was saying. Ronnie saw items in the vehicle that she believed were connected to the rape, including sunglasses, a knife, and a T-shirt. Ronnie had previously seen defendant with the sunglasses. Although she had not seen this knife, she had known defendant to carry knives before.

At some point, Ronnie returned to the house. Later, after everyone was gone, Ronnie returned to the car. She put the items in a garbage bag to hold until she could give them to law enforcement. Deputies arrived before she made it back to the house, and she gave them the items.

Jaron recalled getting off work late that evening and going to the house. There, he learned Thomas had talked to a couple of his friends, who were able to get defendant to come over. Jaron went down to the Ford Explorer. Defendant was walking up the road with one of his friends. Jaron, Thomas, Chauncey G., two other males, and at least one female, gathered by the Explorer and asked defendant to sit in the front passenger seat. Defendant was uninjured. People started questioning him about the rape. For at least 10 minutes, defendant "was in complete denial of it." After Jaron and the others "started piecing little bits and pieces together in front of him," Jaron sensed defendant "had a feel of guilt on his

---

[5] According to Brittany, defendant had been at the house a few weeks earlier, when Y.G. was there. Defendant asked who Y.G. was and was told she was the housekeeper.

[6] Brittany heard defendant mumble a couple of times that he was going to go to jail. Although it was dark out, she could clearly see his face. She did not observe any injuries.

mind," and he admitted raping Y.G.[7] Defendant's backpack was in the trunk area of the Explorer. The group had defendant empty it on the hood of the vehicle. Inside were a black shirt and sunglasses. A knife was on the seat where defendant was sitting. When Jaron asked why defendant committed the rape, defendant said he was "just twacked out," meaning he was on whatever drugs he could find. He also said he did not know why he did it.

Jaron and Chauncey walked back up to the house, because everyone was talking about taking defendant somewhere instead of straight to the sheriff's department. Jaron was concerned they were planning to harm defendant, and he and Chauncey did not want to be a part of that. Thomas remained with the group. About 10 minutes later, Jaron and Brittany left to go to the home of Jaron's parents. The car that the group was in was just leaving. Jaron and Brittany came across two deputies at the corner of Antelope Lane and George Smith Road. Jaron informed them that they had gotten a confession from defendant and where defendant was located. The deputies asked them to go back up to the S. house, which they did.

Around 3:15 a.m. on July 30, Fresno County Sheriff's Deputy Larralde was searching for a cell phone, at the request of Detective Isaac, in the area of the intersection of George Smith Road and Antelope Lane.[8] He had been searching unsuccessfully for about 20 minutes when a van containing two or three people approached. One of its occupants — possibly Jaron — said they had information about the case. They said they knew who committed the rape and had items the suspect used, and they directed Larralde to the S. home. There, Larralde was given a black bag that contained sunglasses and other items. Larralde was also told there were more items in the Ford Explorer, from which he then seized a backpack.

Sheriff's Deputy Little, who had been assisting Larralde in the cell phone search, was getting ready to go to the S. house when a white vehicle drove up.[9] Two females were in the front seat, while two males were in the backseat. All four quickly exited the vehicle. One female in particular was very animated and excited, and started telling Little that they got the rapist. She kept trying to play a recording from a cell phone. When Little asked who they had, she said, "Spencer," and pointed to defendant, who was one of the four people who had gotten out of the car.

Little told defendant to get in Little's patrol truck. Defendant walked toward the patrol truck, and Little followed. Little did not notice defendant limping or anything wrong. At the truck, Little checked defendant for weapons, then asked him to have a seat in the vehicle. Little then closed the door and returned to the female — Alicia N. — to figure out what she was talking about. Alicia, who had been the front seat passenger, played the cell phone recording several times for Little. It was difficult to understand, particularly with Alicia being so excited. Little took possession of the cell phone.

After taking Alicia's statement, Little had defendant step out of the truck. Little handcuffed him. At that time, Little noticed a spot of blood on defendant's shirt

---

[7] Jaron testified that nobody "physically did harm to" defendant when he admitted the rape. Defendant was touched, however, when one person demonstrated on him how he held the knife to Y.G.'s throat. Jaron did not feel defendant was forced to confess. As far as he could recall, nobody threatened to kill defendant if defendant did not confess. He did not confess until the demonstration with the knife, however.

[8] All references to the sheriff's department, deputies and detectives are to the Fresno County Sheriff's Department.

[9] This vehicle was driving south on George Smith Road, from the direction of Highway 180. It did not appear to have come from the residence.

4

sleeve that appeared consistent with him wiping the side of his face with the shirt. There was a cut or scrape on the left side of his face. When Little asked what happened, defendant said he fell down while he was walking. He declined medical attention.

With defendant handcuffed in the back of the patrol truck, Little drove to the S. house, which was about 100 yards west of his location. Little went inside, conferred with Larralde, and took a statement from Chauncey. At the request of detectives, Little then drove defendant, who was detained, to sheriff's headquarters in downtown Fresno. It was a 30-to 45-minute drive, and defendant slept through most of it.

Once at headquarters, Little observed scrapes on defendant's arm. Little asked if defendant did it when he fell, and defendant replied affirmatively. Little then asked if the people who brought defendant to Little had done it to him. Defendant said, "Yes." Little again asked if defendant wanted medical attention. Defendant said, "No." Little then turned him over to detectives.

Isaac advised defendant of his rights, and he stated he understood them. Isaac and her partner, Detective McCormick, then interviewed him. Although Isaac observed some blood and scrapes, defendant appeared coherent and able to answer questions. During the interview (an audio-video recording of which was played for the jury), defendant related that his parents found "weed" in his house and questioned whether it was his, so he got mad and left. He went over to his friend's house and was putting stuff in his friend's car at the end of the driveway, when he saw the cleaning lady pull up. He decided to go up and rape her. He did not know what made him decide to do that. Defendant said he went up as she was vacuuming, put his hand over her mouth, and showed her a knife. He had a shirt over his face and sunglasses on. He had seen her once before but did not know her name. He told her to stay quiet, then took her over by the bed and told her to take everything off. When she complied, he put his penis in her vagina. He did not wear a condom. He put his fingers in her vagina, but not in her anus. He was high on marijuana at the time. Afterward, he left. He took her phone so she would not be able to call someone. He threw it in a field as he was walking on George Smith Road.

After the interview, defendant identified a black T-shirt Larralde had seized as the shirt he wore over his face to hide his identity. Little turned Alicia's cell phone over to Isaac, who listened to the recording. She did not hear any type of confession or statement from defendant on the recording. The recording was poor quality, and Isaac could not make out much of what was said. All she heard was "extremely loud and yelling."

Semen was found on vaginal swabs taken from Y.G. DNA analysis showed defendant was a major contributor to the sperm cell fraction of the vaginal swab, while Y.G. was a minor contributor.[10] A DNA profile that was consistent with that of Y.G. was found on penile swabs taken from defendant. Y.G. was a minor contributor to the mixture of DNA recovered from defendant's right-hand fingernail scrapings.

Scarber, 2019 WL 5958004, at *1–5 (footnotes in original).

---

[10] The chance that a person unrelated to defendant would share the same profile was approximately one in 200 quadrillion.

5

**B.  Petitioner's Absence from Trial and Related Mistrial Motion**

The People rested on December 11, 2012. After the jury was excused for the day, the court and counsel discussed the admissibility of defense exhibits K and L, the audio recording made from Alicia's cell phone and accompanying transcript. [Defense counsel] Alvarez made an offer of proof that defendant would be testifying and could lay the foundation for and authenticate the recording. The recording was played for the court, which also followed along with the transcript. After further discussion of those exhibits, Alvarez presented defense exhibit M, which he represented was a note found by a care provider that morning on the gate to the Scarber family's property. Alvarez asked that defendant also be allowed to address the note during his testimony, as it was relevant to the pressure and fear he experienced and was still experiencing, and why he made certain statements when interviewed by law enforcement. The court stated it wished to conduct further research and consider the parties' arguments, and that it would announce its ruling at 8:30 the next morning, before the jury returned.

The next morning (Dec. 12, 2012), the court went on the record a little after 9:30 a.m. Alvarez stated that he received a telephone call from Kyle Scarber (hereafter Kyle Scarber or Scarber), defendant's father, about 6:00 that morning. Scarber, who sounded emotionally distraught, informed Alvarez that when he went to defendant's room to get him ready for that day's proceedings, he discovered defendant was missing. Law enforcement was contacted and were conducting a search that would include an aerial search. Around 9:15 a.m., Alvarez received another call from Scarber, who stated that "I. Bureau" was now processing the scene, and that sheriff's detectives and "CHP" personnel were there as well. Scarber informed Alvarez that when defendant's room was searched, law enforcement found his wallet, which included his identification, as well as his clothes and personal belongings.

The prosecutor represented that Alvarez notified her of the events around 6:00 a.m., whereupon she contacted Isaac, her chief investigating officer. Isaac informed the prosecutor, about 15 minutes before the court took the bench, that the sheriff's department and the CHP both were investigating the scene. Broken crutches and blood were found on the roadway near the Scarber residence. The sheriff's department and the CHP were investigating that area as well, and believed the scene was staged. In addition, neither defendant's mother nor his sister were home. According to Scarber, the mother and sister left the night before to go to Oceanside. There was no information concerning whether defendant was with them. The sheriff's department "did pings" on what they believed was the mother's cell phone number, but the absence of "pings" after 8:00 the night before suggested the phone was turned off. The prosecutor requested a bench warrant for defendant.

The court observed that section 1043 applied and gave various options. The court believed continuing the matter was the safest and most prudent course at that point, as additional information likely would be developed throughout the day. Accordingly, without any objection from either party, it put the matter over until the next morning.

That afternoon, the court conducted a follow-up hearing. Alvarez represented there had been no developments since that morning. He noted that court had recessed at 3:30 p.m. the day before, as defendant had a 4:00 p.m. doctor's appointment. Alvarez spoke with defendant by telephone at 5:00 p.m., and reiterated that defendant needed to be in court at 8:30 the next morning, i.e.,

December 12, 2012. The only information the prosecutor had was that the sheriff's department and the CHP were conducting an ongoing investigation and were interviewing witnesses.

The court ordered defendant's bond forfeited, and found, in reference to that order, that there was no legal excuse for his nonappearance. The court then recessed until 8:30 the next morning.

The next morning (Dec. 13, 2012), Alvarez represented that defendant's family had had no contact with defendant and did not know where he was.

The prosecutor stated the People's belief that defendant had voluntarily absented himself from trial. She reiterated that the scene of the broken crutches and blood on the road appeared to have been staged, and it did not appear to the sheriff's department that defendant had been abducted or harmed by anyone. She represented that the sheriff's department had interviewed several persons of interest, and all had solid alibis for the pertinent time frame. The prosecutor further stated that she had been informed defendant's mother and sister had left for Oceanside on the night of December 11, 2012. The prosecutor found out on December 12, 2012, from Isaac and Sheriff's Sergeant Christian, that they had spoken to "ICE" agents and learned defendant applied for and was issued a passport on October 24, 2012. Although the passport had not been used, the reason given for the expedited passport was that defendant was going to be going on a vacation November 6, 2012. The prosecutor noted that that was the original trial date set in the case. The prosecutor asserted trial should go forward in defendant's voluntary absence.

Alvarez argued section 1043 was the controlling statute and required a determination whether defendant's absence was voluntarily. Alvarez argued there was insufficient evidence to permit such a finding at that point, as the matter was still under active investigation. Alvarez pointed out that the sheriff's department had issued a press release the previous afternoon in which it was stated that detectives were concerned for defendant's safety due to the circumstances surrounding his disappearance. In light of the fact defendant was facing a life sentence, Alvarez argued that the prudent way to proceed, and to preserve defendant's due process and trial rights, would be to declare a mistrial. Alvarez also pointed out that on the November 6 date, defendant was present and both sides declared they were ready for trial. Trial did not start that day, however, because no courtroom was available.

The prosecutor responded that she did not believe the sheriff's department was aware of the existence of the passport when it issued the press release. She acknowledged defendant appeared on November 6 and on the first day of trial, but took the position defendant wanted to have his passport in hand if trial did not go favorably for him.

The trial court again referenced section 1043, and noted it originally trailed the matter out of an abundance of caution. It now exercised the option of issuing a bench warrant. With respect to the issue whether defendant had voluntarily absented himself, the court observed that the People rested their case at approximately noon on December 11, 2012. Defendant had a medical appointment at 4:00 that afternoon, and had requested to be able to leave no later than 3:30 p.m. Instead of directing the defense to begin at 1:30 p.m., the court accommodated the request to begin the following morning, December 12, 2012, at 9:00 a.m., and it directed defendant to be in court at 8:30 for proceedings on

various motions. Defendant was not present at the appointed time. The court stated:

> "In light of the offer of proof made by the People, and the lack of any satisfactory evidence to the Court on behalf of Defendant, the Court does conclude, and is concluding, that the Defendant has voluntarily absented himself from this proceeding. The timing of his absence coincides with the beginning of his defense. He was here throughout the People's case until the People rested. And the Court fully expected that Defense would begin with him as their first witness yesterday morning ....

> "So, as I stated, the Court is making a finding that Defendant has voluntarily absented himself. And if the Court did grant the mistrial, as requested by Defense Counsel, in the event of a conviction one of the issues before the Court, I'm virtually certain, would be that he was placed once in jeopardy and could not be retried. So whatever concerns in that respect, I think that's a consideration we need to address as well, that the Defendant has [*sic*] placed in jeopardy. And I believe one case that is very instructive relating to the procedural juncture we are at [at] this point is the case of People versus James Snyder .... Citation being 56 Cal.App.3d 195, 128 Cal.Rptr. 297.... And that case discusses virtually the procedural posture of this case up to this point. And the Defendant in Snyder, the Court concluded, voluntarily absented himself. And there was discussion in that case about jeopardy and so on. And the Court in that case as well deferred the trial one full day and allowed the Prosecution's motion to proceed in Defendant's absence where Defendant never later offered an explanation for his absence. And the Court held under those circumstances there was no violation of the Defendant's right to a fair trial in proceeding in his absence. And that's only one case that I've come across, but that case is very instructive in terms of proceeding in absentia at this time."

The court subsequently confirmed that the motion for mistrial was denied. The defense presented no evidence at trial. Following defendant's conviction, sentencing was set for January 15, 2013. On that date, the trial court declined to sentence defendant in absentia. On February 21, 2013, the court calendared further proceedings, defendant having been found in Acapulco, Mexico, and extradited back to the United States.

Scarber, 2019 WL 5958004, at *23–25.

**C. Motion for New Trial**

On March 12, 2013, following defendant's return from Mexico, Alvarez filed a motion to withdraw as counsel of record. On March 20, 2013, he filed a new trial motion on defendant's behalf. On April 12, 2013, the trial court granted Alvarez's request to withdraw the new trial motion and relieved him as attorney of record. On April 25, 2013, Magill became defendant's attorney of record. A briefing schedule was set, and hearing on Magill's motion for a new trial was set for July 29, 2013.

After various continuances, and although the new trial motion had not yet been filed, a hearing was set for October 9, 2013. At this hearing, defendant (who had filed a written offer of proof and first amended and supplemental offer of proof) was permitted to present oral testimony in support of the motion for new trial,

specifically with respect to witnesses he asserted Alvarez should have called at trial.

Defendant testified that when the prosecution rested, he asked Alvarez if he was planning on calling witnesses on defendant's behalf. Alvarez represented that he intended to call no witnesses on defendant's behalf other than defendant. Alvarez "pretty much said" that he did not care what defendant said on the stand, and that in closing argument, he was going to say that defendant might have done it but was on drugs and so doped up that he did not remember doing it.[11] Defendant understood Alvarez to want defendant to testify differently than how defendant had understood his defense. Defendant believed Alvarez was suggesting that defendant testify falsely. After this conversation, defendant went to his knee doctor, then home, then he fled. He fled because he was receiving no support from his attorney and his attorney wanted him to lie on the stand about something defendant did not do.

Defendant testified that he admitted to detectives that he raped Y.G., because he felt threatened for his life and that of his family. He did not feel threatened by the officers but had been threatened that if he did not confess to rape, he, his parents, and his three sisters were going to be killed. Thomas, Jaron, someone named Jesse, Summer, and Alicia were all present when he was threatened. He was beaten by them and in pain from the beating and sought medical treatment for his injuries once he was out on bail. Defendant explained to Alvarez, prior to trial, about the beating and that his statement to law enforcement was false. Defendant believed the group of people were capable of carrying out the threats because of their associates, things he had seen them do, and things he had heard them say. When defendant made the false admissions to law enforcement, the threats were in his mind, although he did not tell the detectives about them even when he made a police report about being assaulted. Thomas was "pretty much the main" person who made the threats. Defendant was aware at the time that Thomas had an illicit marijuana grove about 45 to 65 yards behind Thomas's house. Defendant estimated it contained about 75 plants. Thomas said he wanted defendant to admit raping Y.G. because he wanted someone to blame, and he did not want law enforcement officers snooping around in his house.[12] Defendant was aware Thomas dealt narcotics, and that he kept narcotics in his bedroom, which he kept locked. Defendant did not tell his father, who was a CHP captain, about the threats while he was in custody, although he could have done so. He first told his father (whom he believed was the first person he told) two or three months after his arrest. Defendant did not believe he told Wilson, his attorney at the time.

Nicole L. testified Y.G. was the sister-in-law of John L., Nicole's brother-in-law. She had known Y.G. for a few years. When asked if she had formed an opinion as to Y.G.'s credibility, Nicole said she had, to some extent. She testified that Y.G. had never lied to her directly so far as Nicole was aware, but that she seemed kind of "ditzy" or "air[-]headed."[13]

---

[11] Defendant admitted that during July 2011, he was smoking marijuana and ingesting methamphetamine, and had both in his system when his blood was drawn following the rape.

[12] According to defendant, when Thomas made his threats, the police had already been to the house. They were still looking for suspects, however.

[13] Magill's written supplemental offer of proof claimed Nicole knew of Y.G.'s reputation for sexual promiscuity and lying. This information's purported relevance was to show one of the L. family was having an affair with Y.G. and providing financial assistance to her, and was very possessive of her. This in turn assertedly showed Y.G. had a motive to say she was raped when in fact the sex was consensual. It was the defense theory that someone at the S. residence saw defendant and Y.G. having consensual sex. In this and other instances, the oral testimony at the October 9 hearing was not consistent with or supportive of the written offer of proof.

Cody D. testified that he "hung out" with Thomas and members of the N. family. He was aware Thomas cultivated marijuana, but not at the S. residence. He did not know whether Thomas had assaulted anyone prior to July 2011. When he had been to the S. house, he had not been in Thomas's bedroom.

Bill L. testified that Y.G. was his son's wife's sister. He believed Y.G.'s sister once alleged someone had raped the sister.

Lauren testified that she had known defendant for about three years. They had a dating relationship until five or six months before the events of July 2011. They broke up because defendant was "changing." He spent most of his time with his friends instead of her.

Through defendant, Lauren met Thomas. Through defendant and her boyfriend, Lauren also met Alicia. She also knew Nicole N. She was aware Thomas and Alicia supplied marijuana to defendant.

When Lauren was around Thomas, Thomas was quiet. Lauren assumed he was a good person, although she heard he had a couple of fights with his girlfriend's boyfriend.

Defendant never expressed concern to Lauren about Thomas. After defendant was found in the vehicle in the S. family's front yard, however, Thomas told Lauren and her boyfriend that he let Alicia, Jesse (Alicia's boyfriend at the time) and Summer come and get defendant and "beat him up" to make him confess. They then took him to the police.

Alicia and her family bragged about "beating [defendant] up." They said they "beat him up until he confessed on their phone."

Lauren was afraid to testify, because Alicia and her family were "really mean." They took drugs and they hurt people. They had bragged about killing someone. She believed defendant would have reason to be afraid of them. She never told the police about the N. family, even though she was interviewed by the police on July 29, 2011, and she was aware defendant was on trial. She was scared, but now she was trying to do the right thing.

B.L. testified that Y.G. was his brother's sister-in-law. In July or early August 2011, he ran into Y.G. at the gas station and they spoke briefly. Y.G. said she had been raped. Although she did not normally exhibit any kind of emotion, she seemed a little shaken, confused, and not herself. B.L.'s wife told him that LiAne Sc., who was a member of the Sheriff's Mounted Patrol at one point, expressed concern to her about B.L. being alone with Y.G.

On November 22, 2013, Magill filed a motion for new trial and motion for mistrial. A first amended motion was filed December 5, 2013. As exhibits in support of the new trial request, the defense presented the following:

(1) A transcript of the recording made from Alicia's phone.

(2) Sheriff's office dispatch records ("INCIDENT RECALL") for July 29 through 31, 2011, concerning this case.

(3) A declaration from Attorney Wilson, in which he stated that during the period in which he represented defendant, Kyle Scarber prepared a document listing his

concerns about the investigation and his opinions related to the sheriff's department's investigative protocols and procedures. Wilson was informed and believed this document was provided to Alvarez with the rest of defendant's file when Alvarez replaced Wilson as defendant's attorney.

(4) A declaration from Scarber's brother, stating that late on the night of December 13, 2012, he and Scarber were standing at the entrance to Scarber's driveway when they heard a voice and then a single gunshot was fired at them from the direction of the voice. The sheriff's department incident report did not accurately reflect the summary of events the brother provided to the responding deputy.

(5) A declaration from LiAne, stating that while she was attending a party in December 2011 at the home of Y.G.'s sister, Y.G. — whom LiAne had not met previously — related that she had been " 'attacked' " at the S. residence. In describing what happened, Y.G. never used the word " 'rape.' " When LiAne, then a member of the Sheriff's Mounted Patrol, reported the conversation to her husband, Gary Sc., a sheriff's deputy, LiAne became the subject of an internal affairs investigation into possible witness intimidation. Her daughter, a CHP officer, was told by her commanding officer that she could not speak with LiAne. LiAne's husband was threatened at work that " 'it was going to get ugly,' " and he eventually separated from the sheriff's department without his badge because of the circumstances surrounding this case. LiAne met with Alvarez's investigator, discussed her conversation with Y.G., and was subpoenaed to testify at defendant's trial. Just prior to her scheduled testimony, Alvarez told her that she would not be testifying, and that if she was called to the stand, she would be arrested by the sheriff's office for witness intimidation. Alvarez told her " 'there would be mudslinging' " and he did not want " 'mud to get on [defendant].' " LiAne was never arrested or charged with a crime related to defendant's case.

(6) A declaration from Michelle D., a neighbor of defendant's family, who heard the gunshot on the night of December 13, 2012. The sheriff's report generated from the incident did not accurately reflect the statement she provided to the responding deputy on the night of the incident. She was contacted by several members of the sheriff's department and someone from the CHP Internal Affairs division following the incident. At least one of the officers tried to discredit her by saying she was intoxicated.

(7) A declaration from Julie G., a family nurse practitioner who examined defendant in September 2011, detailing defendant's physical ailments. These included slowed and confused responses, and physical pain and injuries, from which, it was reported, defendant did not suffer prior to his July 29, 2011 assault.

(8) A declaration from Dr. Robert Graham, Julie's supervisor, who also examined defendant on September 8, 2011. Graham agreed with Julie's assessments, evaluations, and opinions of defendant's condition. Although defendant was in a bull riding accident in June 2011, he did not previously present with hypertension, kidney damage, or the other symptoms documented in the chart on September 8, 2011.

(9) A declaration from Dr. Matthew Sciaroni, a podiatrist who examined defendant on July 3, 2012. Defendant's chief complaint was right foot and ankle pain for many months' duration without improvement. Defendant reported that he had been " 'jumped' " by several people and did not specifically feel pain to his feet during the incident. An MRI taken on July 18, 2012, however, showed a

stress fracture to two bones in defendant's right foot. Stress fractures to these bones require a considerable amount of force to produce. Given defendant's age at the time of the injury, he would have healed relatively quickly. Considering the condition of the injury when the MRI was performed, the original trauma would have been "significant."

(10) A declaration from defendant, stating that on July 28, 2011, beginning at around 11:30 p.m., he was held by Thomas, someone known as Jessie, Alicia, Summer, and Jaron. While he was being held, Alicia used her cell phone to record their conversation. He had listened to the recording and reviewed the transcript thereof, and both accurately reflected the conversation.

(11) A declaration from Kyle Scarber, who stated he was employed by the CHP for more than 20 years, and was Assistant Chief of the Central Division when he separated from his employment.

(a) Scarber had known Thomas and Ronnie for years and was aware that Thomas had a reputation for dishonesty and rebellion. In 2010, Scarber told Thomas he was no longer welcome on Scarber's property. That same year, Thomas came to Scarber's home after pulling a knife on Thomas's father. In about August of that year, Scarber caught Thomas burglarizing Scarber's barn. A few months later, Scarber received a call from an administrator at Sanger High School, saying that another student had accused defendant of possessing marijuana. The administrator indicated the student was Thomas. The charges defendant possessed marijuana while on campus or smoked marijuana were not substantiated.

(b) In May 2012, Scarber flew over Squaw Valley with a CHP pilot as part of Scarber's law enforcement responsibilities. He observed a marijuana crop on the S. property of approximately 200 to 500 plants. The sheriff's department was notified, but Scarber was never made aware of any investigation.

(c) In 2011, a mobile home owned by the Scarbers was set on fire. Fire authorities concluded it was arson. Defendant told Scarber that Thomas and Jaron were sending defendant a message that defendant was getting too close to Scarber and knew too much about their criminal activities.

(d) Scarber did not feel Alvarez was ready to be a zealous advocate and conduct a jury trial. To Scarber's knowledge, defendant, who had been out on bail for a few months as of November 2012, was willing to continue the trial until the defense was prepared to try the case. Defendant had knee surgery scheduled for December 3, 2012, and Alvarez was so advised. Scarber believed the surgery was necessitated by the beating defendant suffered on July 29, 2011, because defendant never complained of knee pain before that time. The surgery was performed under general anesthesia, and defendant was prescribed pain medication. The following day, he was still feeling the effects of the surgery and he vomited during jury selection. Alvarez failed to explain to the jury that defendant recently underwent surgery and that it was necessitated by the July 29, 2011 beating. Scarber asked Alvarez if he could "set the trial out," but Alvarez did not respond. Scarber heard a potential juror loudly ask if defendant was vomiting because he was nervous or because he was sick.

(e) The witness list presented at trial included only prosecution witnesses and no defense witnesses. At a meeting between Alvarez, Scarber, and defendant on December 8, a couple days after trial began, Alvarez suggested defendant take the stand and admit the rape, despite the fact he knew defendant always denied

everything but consent. On December 10, outside court, Alvarez suggested it again. On December 11, Alvarez suggested defendant take the stand, admit the rape, and plead for mercy. Alvarez also suggested defendant say he was high. Scarber learned LiAne and Nicole were subpoenaed for the defense case. Nicole appeared, but left without being called to testify. LiAne did not testify.

(f) Alvarez failed to provide all the necessary information to expert witness Dr. Richard Leo, and refused Scarber's requests, based on defendant falling asleep in Little's patrol car and his condition when he was booked, to hire an expert on traumatic brain injury. Scarber, who served seven years in the United States Marine Corps and 25 years in the CHP, had observed several people who suffered head injuries and traumatic brain injury. When he visited defendant in jail on July 30, 2011, defendant showed signs of brain injury. He had difficulty speaking clearly and was unable to fully understand Scarber's statements to him.

(g) A neighbor in Squaw Valley owned a truck similar in color and shape to the one Scarber owned. Scarber had seen Alicia and Thomas drive that truck.

(h) Scarber and his brother were shot at on the night of December 13, 2012, while standing in Scarber's driveway. On or around December 11, Scarber found a threatening note on the fence just outside his home. He advised Alvarez about it. Internal Affairs contacted Alvarez about the note. Alvarez told them he was not Scarber's attorney and could not answer questions about Scarber. Alvarez told CHP that Scarber was paranoid. Alvarez shared information with Internal Affairs that Scarber provided Alvarez to assist with defendant's defense.

(i) Anthony Coelho was a prominent Fresno County businessman and had financial resources available to him that he used to support Margaret Mims's campaign for sheriff. After Scarber told Coelho that the sheriff's office's investigation in this case failed to comply with generally accepted law enforcement practices, Coelho indicated he would provide financial assistance in Scarber's bid to become sheriff. In 2011, Scarber considered running for sheriff in the 2014 election. He told several people about his intention.[14]

(j) Scarber had a four-year-long extramarital affair with Egan in the late 1990's. Egan insisted he divorce his wife, but he refused. When he tried to break it off, Egan became angry and stalked him. Scarber requested assignments outside the Fresno CHP office to get away from her.

The People opposed the motion. As exhibits in support of their opposition, the People presented the following:

(1) A declaration from Attorney Alvarez.

(a) Alvarez denied ever asking or insinuating that defendant should commit perjury or lie about any aspect of the case. Defendant told Alvarez and Alvarez's investigator that he had consensual relations with Y.G. on June 29, 2011, and that was the crux of the defense case, as noted in Alvarez's opening statement to the jury. Alvarez did discuss with defendant the possibilities available, depending on his testimony, such as voluntary intoxication and not forming the intent to commit rape until after defendant entered the house; however, Alvarez was prepared to continue, and anticipated continuing with, the consent defense, as defendant always maintained that position.

---

[14] In his first amended new trial motion, Magill claimed Coelho died "under suspicious circumstances" prior to trial.

(b) Alvarez retained Leo as an expert witness on false confessions and discussed with him the possibility defendant falsely confessed due to being beaten and threatened by civilians. Due to Leo's findings, however, Alvarez decided not to call him as a witness. Alvarez provided Leo's name to the prosecutor in keeping with his discovery obligations, but never provided his findings or discussed the matter other than to state he would not be calling Leo.

(c) Alvarez reviewed Graham and Julie's medical reports but made a tactical decision not to subpoena either person. The medical examinations were all post-July 29, 2011, and had little relevance to the events of that day, particularly in light of what was depicted on the videotape of his interview and the observations of law enforcement and medical personnel who dealt with defendant on July 29 and 30, 2011. Alvarez had "no credible basis" to allege the injuries subsequently diagnosed caused defendant to make a false confession. The issue was whether the confession was coerced, and from defendant's prior statements and anticipated testimony, the false confession was made due to threats to him and his family. That was always defendant's position. In addition, Jaron's testimony and defendant's anticipated testimony were sufficient to establish an argument that the confession was coerced.

(d) Alvarez made the tactical decision not to call LiAne as a witness based on his analysis that her testimony would have caused the case more harm than good. Alvarez never told her that she would be arrested if she testified, but did say that should she testify, the prosecutor would attempt to impeach her with the internal affairs investigation her actions generated, and Alvarez did not want defendant to be tainted with the misconduct that would be alleged against LiAne.

(e) Alvarez chose not to subpoena Alicia or Thomas, as he had no indication either would be helpful to the defense. In addition, having the jury learn that Thomas refused to come to court was, in Alvarez's opinion, beneficial to defendant's position. It was Alvarez's opinion that Alicia would have been a detrimental witness, and it was his intent to have defendant lay the foundation during his testimony for the recording she made on her cell phone.

(2) A declaration from Sheriff's Detective Chapman, who attempted to interview LiAne and her husband regarding allegations of witness intimidation Chapman was investigating. LiAne's husband informed Chapman that he did not wish to make a statement. An attorney informed Chapman that the attorney advised LiAne not to provide a statement. Chapman met with Y.G., who informed him that nothing had changed her willingness to prosecute the case. At no time did she say she did not want to cooperate with the prosecution or that she wanted to " 'withdraw charges.' "[15]

(3) A declaration from Sheriff's Sergeant Pursell, who was assigned to investigate a possible witness intimidation case involving Deputy Gary Sc. and Reserve Deputy LiAne Sc. on January 10, 2012. He was able to determine the Sc.'s knew defendant. As part of his investigations, he reviewed logs of Gary's inquiries into the Fresno Sheriff's database. One query, made August 2, 2011, was of the confidential victim's last name. Twenty-four others related to the Scarbers.

(4) A declaration from Y.G., in which she denied ever telling anyone that she wanted to " 'withdraw charges' " or did not want to cooperate with the

---

[15] In the first amended motion for new trial, Magill asserted that on January 26, 2012, Sheriff Mims told Chief Abrames of the CHP that Y.G. wanted to withdraw charges.

prosecution in this case. On or about December 10, 2011, she attended a jewelry party at her sister's house. Around eight women were present. At the party, LiAne struck up a conversation with her. During the course of the conversation, LiAne insisted Y.G. show her exactly where Y.G.'s residence was. LiAne falsely stated she knew Y.G.'s brother. LiAne asked if Y.G. was the victim of the Squaw Valley rape. Y.G. was hesitant to answer, but LiAne said she had read all the reports and knew the details. Due to LiAne's representation that she was with the sheriff's department, Y.G. said it was her and that it was unnerving to be assaulted in a place you considered safe. Y.G. did not give LiAne a detailed account. She asked if LiAne knew the Scarber family. LiAne said no. At LiAne's request, Y.G. gave her Y.G.'s home telephone number. About a week later, Y.G. had a piano recital in Kingsburg. LiAne unexpectedly arrived with a male. Y.G. was unsure how she knew about the recital. After, LiAne asked for Y.G.'s cell phone number. Y.G. gave it to her. While leaving the recital, Y.G.'s nephew said LiAne looked like the passenger in the truck from an August or September incident in which two females were at the end of Y.G.'s driveway, asking her nephew for her telephone number. On December 20, LiAne telephoned Y.G. to see if she wanted to go Christmas shopping and to lunch. Y.G. declined. LiAne telephoned again on January 4, 2012, but Y.G. was not at home.

(5) A declaration from Sheriff's Detective Davis, who was assigned on December 12, 2012, to handle the crime scene of a missing person (defendant). A travel-size liquor bottle was located on the ground just inside the gate to the Scarber residence. A metal flashlight was found on the ground north of the driveway and west of the gate. Possible blood was found on the flashlight and on the ground and leaves in the area. Two crutches were found with possible blood on them. One shoe was found with possible blood on it. On a bookshelf in defendant's room was a printout of a Google search with the name " 'Brandon Smith,' " a date of birth in July 1989, a Texas driver's license number, and an address in Odessa, Texas.

(6) A declaration from Isaac.

(a) During defendant's return to Fresno, defendant admitted he fled to Mexico during his trial. He also admitted using a false Texas identification in the name of Brandon Smith. Defendant changed his appearance and obtained numerous tattoos during the time of his disappearance.

(b) On August 1, 2011, Isaac was advised that defendant wanted to report he was the victim of an assault that occurred on July 30, 2011. On August 2, 2011, Isaac escorted defendant to headquarters for the interview. Defendant was able to walk to headquarters without any complaints of pain, and he followed Isaac's instructions and was oriented and alert throughout the interview. He answered questions appropriately and recalled details of the events. During the interview, defendant stated that after he was beaten, Thomas did not get into the car with him. The driver of the car told defendant to get in the back, because they were going to drop defendant off at the police station. "Messy," Messy's girlfriend, Jesse, and the driver took him to the sheriff, while Thomas stayed behind at the house.

(c) At approximately 2330 hours on July 29, 2011, Isaac made contact with Larralde at or near the sheriff's substation in Squaw Valley. Isaac asked Larralde to look for Y.G.'s cell phone in the fields near the S. residence. At approximately 0330 hours, Isaac received a call from Larralde, advising that he had obtained the clothing, sunglasses, and knife that were used in the rape and that defendant had

admitted to the rape. Shortly after, Isaac received a call that defendant had been apprehended.

(7) A declaration from Sheriff's Detective McCormick, who interviewed Lauren on July 29, 2011, concerning the rape. Lauren told McCormick that defendant was " 'weird,' " because he kept sending her naked pictures of his penis and asking her to send pictures of herself naked. Lauren said she thought this was " 'creepy' " and so stopped talking to him.[16] As part of her investigation, McCormick listened to jail calls made by defendant. One was made on August 2, 2011, to " 'Kirban.' " In it, defendant stated he had made some " 'bad choices,' " but that the calls were recorded so he did not want to say too much.[17]

(8) A declaration from Sheriff Mims, in which she stated she had a conversation with Chief Abrames in January 2012 but denied telling him Y.G. was going to withdraw charges against defendant.[18]

On December 19, 2013, a hearing was held on the motion. After lengthy argument, the court denied the motion.

Scarber, 2019 WL 5958004, at *33–40 (footnotes in original).

## III.

## STANDARD OF REVIEW

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged convictions arise out of the Fresno County Superior Court, which is located within the Eastern District of California. 28 U.S.C. § 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997) (en banc). The instant petition was filed after the enactment of AEDPA and is therefore governed by its provisions.

---

[16] At the October 9 hearing, Lauren denied making these statements.
[17] The transcript of the call appended to McCormick's declaration reflects defendant added, "And I just let temptation lead me down the wrong path."
[18] Magill gave written notice of his intent to call Abrames and Alvarez at the hearing on the new trial motion in light of the prosecution's opposition to the motion. The court declined to permit additional live testimony, finding no authority requiring it to do so, and stating it had permitted the October 9 hearing out of an abundance of caution.

Under AEDPA, relitigation of any claim adjudicated on the merits in state court is barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Harrington v. Richter, 562 U.S. 86, 97–98 (2011); Lockyer v. Andrade, 538 U.S. 63, 70–71 (2003); Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71 (quoting 28 U.S.C. § 2254(d)(1)). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id. In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir. 2009) (quoting Wright v. Van Patten, 552 U.S. 120, 125 (2008)); Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006). If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Musladin, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, [the] clearly established Federal law." Lockyer, 538 U.S. at 72 (quoting 28 U.S.C. § 2254(d)(1)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 412–13; see also Lockyer, 538 U.S. at 72. "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405 (quoting Webster's Third New International Dictionary 495 (1976)). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc).

"Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413. "[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411; see also Lockyer, 538 U.S. at 75–76. The writ may issue only "where there is no possibility fair minded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents." Richter, 562 U.S. at 102. In other words, so long as fair minded jurists could disagree on the correctness of the state court's decision, the decision cannot be considered unreasonable. Id. If the Court determines that the state court decision is objectively unreasonable, and the error is not structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious effect on the verdict. Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

The Court looks to the last reasoned state court decision as the basis for the state court judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this Court may consider both decisions to ascertain the reasoning of the last decision. Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a federal claim has been presented to a state court and the state court has

1   denied relief, it may be presumed that the state court adjudicated the claim on the merits in the

2   absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at

3   99. This presumption may be overcome by a showing "there is reason to think some other

4   explanation for the state court's decision is more likely." Id. at 99–100 (citing Ylst v.

5   Nunnemaker, 501 U.S. 797, 803 (1991)).

6          Where the state courts reach a decision on the merits but there is no reasoned decision, a

7   federal habeas court independently reviews the record to determine whether habeas corpus relief

8   is available under § 2254(d). Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853

9   (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional

10  issue, but rather, the only method by which we can determine whether a silent state court

11  decision is objectively unreasonable." Himes, 336 F.3d at 853. While the federal court cannot

12  analyze just what the state court did when it issued a summary denial, the federal court must

13  review the state court record to determine whether there was any "reasonable basis for the state

14  court to deny relief." Richter, 562 U.S. at 98. This Court "must determine what arguments or

15  theories . . . could have supported, the state court's decision; and then it must ask whether it is

16  possible fairminded jurists could disagree that those arguments or theories are inconsistent with

17  the holding in a prior decision of [the Supreme] Court." Id. at 102.

18                                              **IV.**

19                                    **REVIEW OF CLAIMS**

20          **A.  Prosecutorial Conflict of Interest**

21          In his first claim for relief, Petitioner asserts that a due process violation and structural

22  error occurred when the Deputy Attorney General, who was a former attorney of, and married to

23  a prosecutor at, the totally recused Fresno County District Attorney's Office, prosecuted

24  Petitioner's case. (ECF No. 3 at 23.)[19] Respondent argues that habeas relief is not warranted

25  because "(1) the state court imposed an independent and adequate procedural bar to relief, (2)

26  Petitioner concedes inability to present controlling precedent, (3) Petitioner presented the state

27

28  _____
    [19] Page numbers refer to the ECF page numbers stamped at the top of the page.

1   court with insufficient evidence of error and prejudice, and (4) Petitioner fails to prove actual

2   prejudice here." (ECF No. 17 at 23.)

3          This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate

4   District, which denied the claim in a reasoned opinion. The claim was also raised in the

5   California Supreme Court, which summarily denied Petitioner's petition for review. As federal

6   courts review the last reasoned state court opinion, the Court will "look through" the California

7   Supreme Court's summary denial and examine the decision of the California Court of Appeal.

8   See Wilson, 138 S. Ct at 1192.

9          In denying Petitioner's prosecutorial conflict of interest claim, the California Court of

10  Appeal stated:

11          Defendant contends the deputy attorney general who prosecuted the case had a
            fatal conflict of interest such that structural error resulted. Related to this are
12          claims of prosecutorial misconduct. We conclude that to the extent the issues are
            cognizable on appeal, defendant has not established cause for reversal.
13

14  **A. Background**

15          Insofar as the record on appeal shows, prosecution in this case was initiated by
            complaint filed on August 2, 2011. The matter was prosecuted by the Fresno
16          County District Attorney's Office, which was then headed by Elizabeth A. Egan.

17          On October 10, 2011, Roger D. Wilson, then defendant's attorney, wrote a letter
            to Egan in which he stated that while he did not believe Egan was personally
18          biased against defendant, he was concerned about the posture taken by the district
            attorney's office in asking for an increase in bail and making no offer less than
19          life in prison. Wilson believed this position was based, at least in part, on a desire
            to avoid "any hint of favoritism" toward defendant because his father was the area
20          commander of the California Highway Patrol (CHP). The letter concluded:
            "Consequently, I am respectfully requesting that you voluntarily recuse your
21          office from prosecuting this case and transfer the prosecution to the California
            Attorney General's Office. By taking this action, your office can avoid any
22          appearance of impropriety with respect to the prosecution of the son of the Area
            Commander of the California Highway Patrol, and also maintain the professional
23          working relationship that your office presently enjoys with Captain Scarber."

24          On November 23, 2011, the Attorney General's Office agreed to prosecute the
            case.[20] On November 28, 2011, several months prior to the preliminary hearing,

25  ─────────────────────
    [20] No formal motion for recusal (§ 1424) was ever filed. The record contains evidence, in the form of a declaration
26  executed by defendant's father in support of defendant's motion for a new trial, that the father and Egan had a
    romantic relationship in the late 1990's, and that it ended badly. The record does not reveal what effect, if any, this
27  alleged relationship had on the decision to turn the case over to the Attorney General.
            On appeal, defendant chides the Attorney General for failing to recognize that the district attorney's office
    did in fact recuse itself, and instead stating that the Attorney General's office agreed it would prosecute the case. For
28  practical purposes, the effect of what occurred was the recusal of the district attorney's office, and the Attorney

the case was assigned to then-Deputy Attorney General Le Mon (hereafter "the prosecutor").

On April 5, 2012, Wilson was relieved as counsel for defendant, and Antonio Alvarez substituted in as attorney of record. Alvarez represented defendant throughout trial, but was permitted to withdraw, on defendant's motion, on April 12, 2013. On April 25, 2013, Charles Magill became defendant's attorney of record.[21]

On November 22, 2013, Magill filed a motion for new trial and motion for mistrial on defendant's behalf. The grounds asserted in support of a new trial were ineffective assistance of trial counsel, newly discovered evidence, and prosecutorial misconduct for failure to disclose *Brady* material.[22] The motion for mistrial was predicated on trial having proceeded in defendant's absence.[23]

On December 5, 2013, Magill filed an amended motion for new trial and mistrial. The same grounds were raised. In addition, defendant sought dismissal for *Brady* violations. In the amended motion, as in the original motion, Magill represented that he was aware the prosecutor previously was employed as a member of the Fresno County District Attorney's Office, and that she currently was married to Carl Monopoli, a member of that office. At no time, either in his written pleadings or his argument in support of the motion, did he assert she had an ongoing conflict of interest.[24]

**B. Analysis**

### 1. *Conflict of interest and exercise of prosecutorial discretion*

Defendant contends on appeal the prosecutor had a conflict of interest, based on her marriage to an attorney in the Fresno County District Attorney's Office, that permeated proceedings and thereby created structural defects such that reversal is required. He says that when Egan recused the entire district attorney's office, it constituted a concession that no attorney in that office could give defendant a fair trial and/or exercise prosecutorial discretion evenhandedly, yet no procedures were put in place to screen the prosecutor, erect an ethical wall between the district attorney's and Attorney General's offices, or prohibit communication about the case between the prosecutor and her spouse.

Defendant says the prosecutor never disclosed the conflict on the record or obtained a waiver from defendant. He also claims the prosecutor exercised her

---

General does not dispute that. The settled statement obtained pursuant to this court's order in response to defendant's application therefor, however, expressly states that "the Attorney General's Office agreed to prosecute the case." It does not state that the district attorney's office recused itself. The Attorney General was precise concerning the actual contents of the record.

[21] Attorney Laura M. Guzman Magill acted as cocounsel, appearing with defendant at times and submitted pleadings on his behalf. She passed away during the pendency of the posttrial proceedings. For clarity, references to "Magill" encompass pleadings filed or arguments made by either or both Charles Magill and Laura M. Guzman Magill, without differentiation.

[22] *Brady v. Maryland* (1963) 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (*Brady*).

[23] The circumstances surrounding defendant's absence will be discussed in greater detail, *post*.

[24] The closest Magill came was to accuse the government of being aware of the "nefarious" nature of Thomas's involvement in the case and intending to suppress his involvement in a "forced" confession. Magill noted the government was represented by an attorney "who formerly worked for the District Attorney's Office, is married to a current Deputy District Attorney, and was pregnant with the Deputy District Attorney's child."

discretion in a manner that deprived defendant of his right to a fair trial by (1) not investigating Thomas, Alicia, and the others to whom defendant initially confessed; the firing of a shot at defendant's father on December 13, 2012; or a threatening note left on the gate of defendant's residence on December 11, 2012; (2) failing to employ methods of investigation necessary to protect defendant's constitutional rights; (3) not charging any of the group to whom defendant initially confessed, based on the physical abuse defendant suffered at their hands; (4) failing to call Thomas and Alicia as witnesses; and (5) not granting immunity to Thomas and Alicia.

Not one of these claims was made at trial.[25] Defendant cites no case, and our own research has revealed none, in which an appellate court has ruled on a claim of the type asserted here on direct appeal without the issue having first been raised in the lower court. (See, e.g., *People v. Gamache* (2010) 48 Cal.4th 347, 361-366, 106 Cal.Rptr.3d 771, 227 P.3d 342 & cases cited; *People v. Vasquez* (2006) 39 Cal.4th 47, 52-53, 57, 45 Cal.Rptr.3d 372, 137 P.3d 199; *People v. Breaux* (1991) 1 Cal.4th 281, 293, 294-295, 3 Cal.Rptr.2d 81, 821 P.2d 585; *People v. Hamilton* (1988) 46 Cal.3d 123, 138-140, 249 Cal.Rptr. 320, 756 P.2d 1348; *People v. Choi* (2000) 80 Cal.App.4th 476, 482-483, 94 Cal.Rptr.2d 922; *People v. Lopez* (1984) 155 Cal.App.3d 813, 827-828, 202 Cal.Rptr. 333; see also *Young v. United States ex rel. Vuitton et Fils S.A.* (1987) 481 U.S. 787, 792, 107 S.Ct. 2124, 95 L.Ed.2d 740.)

All but one of the foregoing cases deal with recusal of a district attorney's office, or one or more attorneys in such an office, pursuant to section 1424. Section 1424 provides in part: "(a)(1) Notice of a motion to disqualify a district attorney from performing an authorized duty shall be served on the district attorney and the Attorney General at least 10 court days before the motion is heard.... The district attorney or the Attorney General, or both, may file affidavits in opposition to the motion and may appear at the hearing on the motion .... The judge shall review the affidavits and determine whether or not an evidentiary hearing is necessary. The motion may not be granted unless the evidence shows that a conflict of interest exists that would render it unlikely that the defendant would receive a fair trial. An order recusing the district attorney ... may be reviewed by extraordinary writ or may be appealed by the district attorney or the Attorney General.... If the motion is brought at or before the preliminary hearing, it may not be renewed in the trial court on the basis of facts that were raised or could have been raised at the time of the original motion."

Clearly, section 1424 contemplates that a recusal motion must be brought in superior court in the first instance. (See generally *Packer v. Superior Court* (2014) 60 Cal.4th 695, 698, 181 Cal.Rptr.3d 41, 339 P.3d 329.)

Defendant baldly asserts that section 1424 and cases construing it "do not contemplate the need to recuse a Deputy Attorney General or possibly, the entire Attorney General's office." We fail to see why the standards or analysis should be different simply depending on whether the trial prosecutor at issue is a deputy district attorney or a deputy attorney general. (See Gov. Code, § 12550.) In either instance, it is the protection of prosecutorial impartiality that is at issue. (See *People v. Hamilton, supra*, 46 Cal.3d at p. 140, 249 Cal.Rptr. 320, 756 P.2d 1348.)

---

[25] Contrary to defendant's apparent belief, the mere mention of the prosecutor's marriage and previous employment does not constitute raising the issue.

Defendant appears to contend he may raise the issue for the first time on appeal, because new rules for the conduct of criminal prosecutions apply retroactively to all nonfinal cases (*People v. Song* (2004) 124 Cal.App.4th 973, 982, 22 Cal.Rptr.3d 118), and, he claims, *People v. Dekraai* (2016) 5 Cal.App.5th 1110, 210 Cal.Rptr.3d 523 (*Dekraai*) announced such a rule regarding recusal of a district attorney's office.[26] To the contrary, *Dekraai* applies existing law to an unusual fact pattern. That means the opinion meets the standards for certification for publication. (Cal. Rules of Court, rule 8.1105(c)(2).) It does not mean it announces a new rule. (See *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 712, 76 Cal.Rptr.3d 250, 182 P.3d 579.)

We conclude defendant's failure to raise the prosecutor's alleged conflict and abuse of prosecutorial discretion in the trial court precludes him from raising those issues on appeal. (See *People v. Lewis* (2001) 26 Cal.4th 334, 375, 110 Cal.Rptr.2d 272, 28 P.3d 34; *People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13, 22 Cal.Rptr.2d 689, 857 P.2d 1099, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22, 87 Cal.Rptr.3d 209, 198 P.3d 11 (*Doolin*).) That being the case, we decline to take judicial notice, as defendant asks us to do, of a certified copy of the prosecutor's marriage certificate and an attorney profile from the California State Bar showing that in November 2016, the business address of an attorney with the same name as the prosecutor's spouse was the Fresno County District Attorney's Office. Although it appears the documents fall within the provisions of Evidence Code sections 452 and 459, only relevant material may be noticed. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1326, 144 Cal.Rptr.3d 427, 281 P.3d 412, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3, 188 Cal.Rptr.3d 328, 349 P.3d 1028.) Because the documents relate to an issue that is not properly before us, they are not relevant.[27]

Moreover, taking judicial notice would contravene the general rule that judicial notice should not be taken by an appellate court if the matter was not presented to and considered by the trial court in the first instance. (See *People v. Peevy* (1998) 17 Cal.4th 1184, 1208, fn. 4, 73 Cal.Rptr.2d 865, 953 P.2d 1212; *People v. Hardy* (1992) 2 Cal.4th 86, 134, 5 Cal.Rptr.2d 796, 825 P.2d 781.) "Such a rule prevents the unfairness that would flow from permitting one side to press an issue or theory on appeal that was not raised below. [Citation.]" (*People v. Hardy, supra*, at p. 134, 5 Cal.Rptr.2d 796, 825 P.2d 781.) " '[A]n appellate court generally is not the forum in which to develop an additional factual record.' [Citations.]" (*People v. Castillo* (2010) 49 Cal.4th 145, 157, 109 Cal.Rptr.3d 346, 230 P.3d 1132.)

---

[26] Defendant does not explain how, if section 1424 and cases concerning district attorney recusal are somehow inapplicable where the prosecutorial agency is the Attorney General's Office, *Dekraai* nevertheless applies. Moreover, we cannot help but note that the appellate court in *Dekraai* had before it an "extensive" record resulting from two evidentiary hearings in which the trial court heard from 39 witnesses. (*Dekraai, supra*, 5 Cal.App.5th at p. 1114.)

[27] We recognize that we permitted defendant to obtain a settled statement with respect to the matter. This does not mean the overall issue is properly before us, however. "[T]he purpose of a settled statement is to provide the appellate court with a record of trial court proceedings for which there is no formal contemporary record .... Consistent with this limited purpose, the settled statement is 'intended to ensure that the record transmitted to the reviewing court preserves and conforms to the proceedings actually undertaken in the trial court,' not to 'allow parties to create proceedings, make records, or litigate issues which they neglected to pursue earlier.' [Citations.]" (*People v. Anderson* (2006) 141 Cal.App.4th 430, 440, 45 Cal.Rptr.3d 910; see *People v. Tuilaepa* (1992) 4 Cal.4th 569, 585, 15 Cal.Rptr.2d 382, 842 P.2d 1142, affd. *sub nom. Tuilaepa v. California* (1994) 512 U.S. 967, 114 S.Ct. 2630, 129 L.Ed.2d 750 & disapproved on another ground in *People v. Harris* (2008) 43 Cal.4th 1269, 1311, 78 Cal.Rptr.3d 295, 185 P.3d 727.)

Although Code of Civil Procedure section 909 and California Rules of Court, rule 8.252 permit a reviewing court to make, in limited circumstances, factual determinations contrary to or in addition to those made by the trial court, "because this is a criminal case and because [defendant] did not waive his right to jury trial, we cannot take additional evidence on appeal. [Citation.]" (*People v. Hayes* (1992) 3 Cal.App.4th 1238, 1246, fn. 4, 5 Cal.Rptr.2d 105; accord, *People v. Pena* (1972) 25 Cal.App.3d 414, 421, 101 Cal.Rptr. 804, disapproved on another ground in *People v. Duran* (1976) 16 Cal.3d 282, 292, 127 Cal.Rptr. 618, 545 P.2d 1322.)

Finally, assuming there might exist some unusual circumstances that would permit issues of the type defendant now argues to be raised for the first time on appeal, the record before us would be insufficient — even with judicial notice of the proffered documents — to permit meaningful review of defendant's claims. (See *People v. Waidla, supra,* 22 Cal.4th at pp. 743-744, 94 Cal.Rptr.2d 396, 996 P.2d 46.) We simply do not have the necessary information or know what might have been developed had the issue been litigated below. Defendant essentially seeks to have us presume the existence of a fatal conflict based on the prosecutor's past employment and marital relationship, and to assume the prosecutor violated her ethical duties or that sufficient ethical "walls" or "screens" could not be or were not erected. We will not make such assumptions from a silent record. (See *People v. Jennings, supra,* 53 Cal.3d at p. 375, 279 Cal.Rptr. 780, 807 P.2d 1009; *Melcher v. Superior Court* (2017) 10 Cal.App.5th 160, 163, 170, 215 Cal.Rptr.3d 871; *People v. Hernandez* (1991) 235 Cal.App.3d 674, 680-681, 286 Cal.Rptr. 652.)[28]

### 2. *Unethical conduct*

In a related claim, defendant contends the proceedings were fundamentally unfair due to the unethical conduct of the prosecution team. Defendant bases this claim on rule 3.8 and its Comment. The rule states, in pertinent part:

> "The prosecutor in a criminal case shall: [¶] ... [¶]

> "(b) make reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel; [¶] ... [¶]

---

[28] In conjunction with the settled statement, the prosecutor executed a declaration in which she stated she did not recall any discussions, motions, or arguments made *in court* regarding an " 'ethical wall' " being erected. Her declaration does not preclude the possibility disclosure was made, and discussions had, in chambers or off the record.

Defendant admits he has no way of knowing whether the prosecutor and her spouse actually discussed defendant's case, but says "[s]uch an inquiry would be 'repulsive to the notions of privacy surrounding the marriage relationship.' " His cited authority is *Griswold v. Connecticut* (1965) 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510, in which the United States Supreme Court struck down as unconstitutional a state law forbidding the use of contraceptives. *Griswold* does not establish any kind of blanket prohibition against questioning a married couple about any of their communications; rather, what the high court found "repulsive" was the notion of allowing police "to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives[.]" (*Id.* at pp. 485-486, 85 S.Ct. 1678.) Although California respects the privacy of the marital relationship (Evid. Code, §§ 970-971, 980), such privileges are not absolute (see *People v. Dorsey* (1975) 46 Cal.App.3d 706, 716-717, 120 Cal.Rptr. 508; *Frey v. Superior Court* (1965) 237 Cal.App.2d 201, 203-204, 46 Cal.Rptr. 747). We cannot know whether the prosecutor and/or her spouse would have waived any applicable privileges had they been questioned concerning their communications, if any, about this case. The point is, they were not asked, because the issue was never raised and litigated.

"(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that the prosecutor knows or reasonably should know tends to negate the guilt of the accused ... ; and

"(e) exercise reasonable care to prevent persons under the supervision or direction of the prosecutor, including ... persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under rule 3.6."[29] (Rule 3.8.)

The Comment to rule 3.8 provides, in pertinent part:

"[1] A prosecutor has the responsibility of a minister of justice and not simply that of an advocate. This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice, that guilt is decided upon the basis of sufficient evidence, and that special precautions are taken to prevent and to rectify the conviction of innocent persons. This rule is intended to achieve those results. All lawyers in government service remain bound by rules 3.1 [concerning meritorious claims and contentions] and 3.4 [concerning fairness to opposing party and counsel]. [¶] ... [¶]

"[3] The disclosure obligations in paragraph (d) are not limited to evidence or information that is material as defined by *Brady*[, *supra*,] 373 U.S. 83, 83 S.Ct. 1194 ... and its progeny. For example, these obligations include, at a minimum, the duty to disclose impeachment evidence or information that a prosecutor knows or reasonably should know casts significant doubt on the accuracy or admissibility of witness testimony on which the prosecution intends to rely.... Nothing in this rule is intended to be applied in a manner inconsistent with statutory and constitutional provisions governing discovery in California courts.... [¶] ... [¶]

"[5] Paragraph (e) supplements rule 3.6, which prohibits extrajudicial statements that have a substantial likelihood of prejudicing an adjudicatory proceeding...."[30]

Defendant says the prosecution team's conduct was unethical and deprived him of procedural justice because, following recusal of the district attorney's office, (1) the Attorney General never established a conflict screen to ensure that any prosecutor involved in the case did not have a conflict; (2) the Attorney General

---

[29] Rule 3.6 concerns trial publicity. With some exceptions, it prohibits "[a] lawyer who is participating or has participated in the investigation or litigation of a matter" from "mak[ing] an extrajudicial statement that the lawyer knows or reasonably should know will (i) be disseminated by means of public communication and (ii) have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." (Rule 3.6(a).)

    The current rules and comments contain asterisks that identify words or phrases defined in rule 1.0.1. We have omitted the asterisks for ease of readability.

[30] Rule 3.8 is the successor to former rule 5-110, which was adopted effective May 1, 2017, and amended, with respect to paragraph (d) of the rule and related portions of the Comment (previously, the Discussion), effective November 2, 2017. For purposes of the issues defendant raises on this appeal, there is no material difference between rule 3.8 and former rule 5-110 as amended.

    By separate order, we take judicial notice of the Supreme Court of California Administrative Order 2017-04-26, filed May 1, 2017 ("ORDER RE REQUEST FOR APPROVAL OF AMENDMENTS TO RULE 5-110 AND RULE 5-220 OF THE RULES OF PROFESSIONAL CONDUCT OF THE STATE BAR OF CALIFORNIA"); and Supreme Court of California Administrative Order 2017-11-01, filed November 2, 2017 ("ORDER GRANTING EXPEDITED APPROVAL OF PROPOSED AMENDMENTS TO RULE 5-110 OF THE CALIFORNIA RULES OF PROFESSIONAL CONDUCT").

assigned a deputy attorney general who in fact had a conflict based on her prior employment and marriage; (3) the deputy attorney general never disclosed the conflict and did not address it when it was raised in the new trial motion; (4) the Attorney General had imputed knowledge of the conflict, but took no steps to rectify the procedural injustice; and (5) no procedures or regulations were put in place to verify that the prosecutor assigned to the case did not have any ongoing conflict, and to monitor contact between members of the recused office and the assigned prosecutor in order to protect defendant's rights.

Defendant did not raise any of these issues at trial. He claims, however, that he is to be given the benefit of developments in the law — including new ethical rules — that occurred while his appeal was pending. Defendant cites no authority addressing the retroactive application of new ethical rules, and we are not convinced they apply to the conduct of trials that were completed before the rules went into effect. Even if defendant is correct in this regard, however, the record on appeal is insufficient to permit us to address his claims in a meaningful manner.[31] Defendant appears to expect us to make assumptions as to what occurred or was known or disclosed based on a silent record. It would be improper for us to do so. Accordingly, his claims fail.

Scarber, 2019 WL 5958004, at *6–15 (footnotes in original).

1. Procedural Default

A federal court will not review a petitioner's claims if the state court has denied relief on those claims pursuant to a state law procedural ground that is independent of federal law and adequate to support the judgment. Coleman v. Thompson, 501 U.S. 722, 729–30 (1991). This doctrine of procedural default is based on the concerns of comity and federalism. Id. at 730–32. However, there are limitations as to when a federal court should invoke procedural default and refuse to review a claim because a petitioner violated a state's procedural rules. Procedural

---

[31] We have examined several cases addressing retroactivity in criminal cases. In each instance, the trial record was adequate to permit resolution of the issue on appeal. (See, e.g., Danforth v. Minnesota (2008) 552 U.S. 264, 267, 128 S.Ct. 1029, 169 L.Ed.2d 859 [admission at trial of videotaped interview of victim, who did not testify, challenged on confrontation clause grounds; issue was retroactivity of subsequent holding in Crawford v. Washington (2004) 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177]; Teague v. Lane (1989) 489 U.S. 288, 292-294, 109 S.Ct. 1060, 103 L.Ed.2d 334 [after prosecutor exercised peremptory challenges to excuse African-American prospective jurors, defendant claimed denial of fair cross-section of community; issue was retroactivity of subsequent holding in Batson v. Kentucky (1986) 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69]; Griffith v. Kentucky (1987) 479 U.S. 314, 316, 317-320, 107 S.Ct. 708, 93 L.Ed.2d 649 [prosecutors used peremptory challenges to excuse all African-American prospective jurors in two cases; equal protection claim raised at trial in first case, and representative cross-section and right to impartial jury claims raised in other case; issue was retroactivity of holding in Batson]; People v. Ashmus (1991) 54 Cal.3d 932, 991, 2 Cal.Rptr.2d 112, 820 P.2d 214 [victim-impact evidence admitted at penalty phase of trial despite United States Supreme Court authority holding such evidence was inadmissible per se; new United States Supreme Court authority overruling prior cases applied retroactively], abrogated on another ground in People v. Yeoman (2003) 31 Cal.4th 93, 117, 2 Cal.Rptr.3d 186, 72 P.3d 1166; People v. Song, supra, 124 Cal.App.4th at pp. 980, 981-982, 22 Cal.Rptr.3d 118 [admission of statements by defendant's codefendants to police challenged at trial as violative of Bruton v. United States (1968) 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 & People v. Aranda (1965) 63 Cal.2d 518, 47 Cal.Rptr. 353, 407 P.2d 265; on appeal, Crawford held to apply retroactively].)

default can only block a claim in federal court if the state court "clearly and expressly states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989). In determining whether a state procedural ruling bars federal review, the Court looks to the "last reasoned opinion on the claim." Ylst, 501 U.S. at 804. See id. at 802 (defining an unexplained order as one "whose text or accompanying opinion does not disclose the reason for the judgment").

Here, the California Court of Appeal found that Petitioner's "failure to raise the prosecutor's alleged conflict and abuse of prosecutorial discretion in the trial court precludes him from raising those issues on appeal." Scarber, 2019 WL 5958004, at *9. This is known as the contemporaneous objection rule. As the California Court of Appeal clearly and expressly stated that its decision on the prosecutorial conflict of interest claims rest on a state procedural bar, procedural default is appropriate if the state procedural bar is independent and adequate.

To qualify as "independent," a state procedural ground "must not be 'interwoven with the federal law.'" Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000) (quoting Michigan v. Long, 463 U.S. 1032, 1040–41 (1983)). "To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" Walker v. Martin, 562 U.S. 307, 316 (2011) (quoting Beard v. Kindler, 558 U.S. 53, 60 (2009)). The Ninth Circuit has taken a burden-shifting approach to determining the adequacy of a state procedural ground. See Bennett v. Mueller, 322 F.3d 573, 586 (9th Cir. 2003). First, the respondent must plead an independent and adequate state procedural bar as an affirmative defense. The burden then shifts to the petitioner "to place that defense in issue," and can be satisfied by "asserting specific factual allegations that demonstrate the inadequacy of the state procedure, including citation to authority demonstrating inconsistent application of the rule." Id. If the petitioner satisfies his burden, the burden shifts back to the respondent, which bears "the ultimate burden of proving the adequacy" of the state procedural bar. Id. at 585–86.

The Ninth Circuit has previously recognized that California's contemporaneous objection rule is an adequate and independent state procedural ground that constitutes a valid basis for procedural default. See Fairbank v. Ayers, 650 F.3d 1243, 1256–57 (9th Cir. 2011) (applying bar

1  in context of prosecutorial misconduct); <u>Paulino v. Castro</u>, 371 F.3d 1083, 1093 (9th Cir. 2004)

2  (applying bar in context of jury instruction); <u>Melendez v. Pliler</u>, 288 F.3d 1120, 1124 (9th

3  Cir.2002) (applying bar in context of admission of evidence); <u>Vansickel v. White</u>, 166 F.3d 953,

4  957–58 (9th Cir.1999) (applying bar in context of peremptory challenge); <u>Rich v. Calderon</u>, 187

5  F.3d 1064, 1070 (9th Cir. 1999) (applying bar in context of prosecutorial misconduct). Petitioner

6  does not place the defense in issue by arguing that the contemporaneous objection rule is not

7  firmly established or inconsistently applied. Accordingly, the Court finds that the California

8  Court of Appeal applied an independent and adequate state procedural rule, and Petitioner has

9  procedurally defaulted this claim. <u>See</u> <u>Howard v. Campbell</u>, 305 F. App'x 442, 444 (9th Cir.

10  2008) (holding failure to comply with California's independent and adequate contemporaneous

11  objection rule results in a procedural default of a prosecutorial misconduct claim) (citing <u>Rich</u>,

12  187 F.3d at 1069–70).

13     A petitioner "may obtain federal review of a defaulted claim by showing cause for the

14  default and prejudice from a violation of federal law." <u>Martinez v. Ryan</u>, 566 U.S. 1, 10 (2012)

15  (citing <u>Coleman</u>, 501 U.S. at 750). Here, Petitioner argues that he "did not know of the issue

16  between the Deputy District Attorney and the Assistant Attorney General until after the trial had

17  concluded. Making the point that he did not raise this argument at trial ignores the concealment

18  of that fact during the trial itself." (ECF No. 20 at 6–7.) Although a showing that the factual basis

19  for the claim was not reasonably available at the time may constitute cause to excuse the default,

20  <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986), the California Court of Appeal found that

21  Petitioner's "failure to raise the prosecutor's alleged conflict and abuse of prosecutorial

22  discretion *in the trial court* precludes him from raising those issues on appeal," <u>Scarber</u>, 2019

23  WL 5958004, at *9 (emphasis added). Even if the defense did not know of the issue during the

24  trial itself, the record indicates that defense counsel was aware that the prosecutor previously was

25  employed as a member of the Fresno County District Attorney's Office and that she was married

26  to a member of that office at the time the first amended motion for new trial was filed. (3 CT

27  810.) This issue could have been raised in the motion for new trial and addressed by the trial

28  court. Accordingly, Petitioner has not established cause for the default.

1    In any case, as set forth below, the Court finds that the state court's denial of relief on the

2    merits for lack of supporting evidence was not contrary to, or an unreasonable application of,

3    clearly established federal law, nor was it based on an unreasonable determination of fact. See

4    Apelt v. Ryan, 878 F.3d 800, 825 (9th Cir. 2017) ("[W]hen a state court 'double-barrels' its

5    decision—holding that a claim was procedurally barred and denying the claim on its merits—

6    both its procedural default ruling and its merits ruling are entitled to deferential review by federal

7    courts, as intended by AEDPA.").

8         2.  Merits Analysis

9         Petitioner contends that he "was deprived of his fundamental constitutional rights to a fair

10   trial and due process when the Attorney General appointed a Deputy Attorney General who

11   within less than the two years prior to becoming a Deputy Attorney General had worked in the

12   Fresno County whose spouse was still an attorney in the recused office. These circumstances

13   amounted to structural error at the trial and Mr. Scarber was denied due process as a result."

14   (ECF No. 3 at 24.) Petitioner states that this claim "presents a unique set of facts and application

15   of the law regarding a question of first impression." (Id.). When a United States Supreme Court

16   case "does not 'squarely address[] the issue in th[e] case' or establish a legal principle that

17   'clearly extend[s]' to a new context to the extent required by the Supreme Court . . . it cannot be

18   said, under AEDPA, there is 'clearly established' Supreme Court precedent addressing the issue

19   before us, and so we must defer to the state court's decision." Moses, 555 F.3d at 754 (alterations

20   in original) (citations omitted). As Petitioner has acknowledged, this claim "presents a unique set

21   of facts and application of the law regarding a question of first impression." (ECF No. 3 at 24.)

22   Accordingly, the state court's denial of Petitioner's prosecutorial conflict of interest claim was

23   not contrary to, or an unreasonable application of, clearly established federal law, nor was it

24   based on an unreasonable determination of fact. The decision was not "so lacking in justification

25   that there was an error well understood and comprehended in existing law beyond any possibility

26   of fairminded disagreement." Richter, 562 U.S. at 103. Based on the foregoing, Petitioner is not

27   entitled to habeas relief on his first claim, and it should be denied.

28   ///

**B.  Admission of Petitioner's Statements**

In his second claim for relief, Petitioner asserts that the trial court erred in admitting statements he made to both law enforcement and civilians. (ECF No. 3 at 33–46.) Respondent argues that habeas relief is not warranted because a "fairminded jurist could agree with the state court that (1) the Constitution does not bar admissions elicited through purely civilian coercion; (2) there was insufficient evidence of law-enforcement coercion (including Petitioner's medical state during law-enforcement questioning) which could have rendered Petitioner's confession involuntary, and (3) admission of Petitioner's confessions was harmless." (ECF No. 17 at 27.)

This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate District, which denied the claim in a reasoned opinion. The claim was also raised in the California Supreme Court, which summarily denied Petitioner's petition for review. As federal courts review the last reasoned state court opinion, the Court will "look through" the California Supreme Court's summary denial and examine the decision of the California Court of Appeal. See Wilson, 138 S. Ct at 1192.

In denying Petitioner's claim regarding admission of his statements to civilians and law enforcement, the California Court of Appeal stated:

> Defendant contends the trial court erred by finding his statements were voluntary. In this regard, he challenges the admission into evidence of his statements both to the civilians he terms "vigilantes" and to law enforcement. We conclude the statements were properly admitted, but if error occurred, it was harmless beyond a reasonable doubt.
>
> **A. Background**
>
> The People moved, in limine, to admit defendant's statements that were made to Thomas, Jaron, Alicia, and detectives. The People asserted the statements were admissible under Evidence Code section 1220, there was no police coercion and the statements were voluntarily made.
>
> At the hearing on the in limine motions, Isaac testified defendant was under arrest when brought to her office by Little. The interview began at approximately 5:50 a.m. on July 30, 2011, and was audio-and videotaped. Prior to the interview, Isaac observed some blood on defendant's head and knee. His hands were dirty, and he looked like he had been beaten up or in a fight. McCormick asked if he wanted medical attention, but he declined.

After Isaac turned on the recording equipment, she advised defendant of his *Miranda* rights, which she read from a department-issued card. Defendant stated he understood each of his rights.[32] Isaac never obtained an express waiver, as defendant just started talking when she asked what was going on. During the interview, he mentioned that he had been beaten up.[33] Her perception of him was that he was oriented and alert. She never had to repeat questions, and he appeared to answer appropriately. At the end of the interview, she told him they were going to take him to the hospital and have him checked out.[34] She did not have him medically checked prior to interviewing him because he refused. Had he been in any distress, however, she would have called an ambulance. Isaac was aware defendant had turned 19 years old two or three weeks prior to the incident, and that, as far as she knew, he had not slept for approximately 20 hours. He also told her he had smoked marijuana. He had been in custody for about two hours before the interview commenced.

The defense presented no evidence.

The prosecutor argued that defendant was read his *Miranda* rights and stated he understood them, and there clearly was an implied waiver of rights. She argued there was no coercion or use of police tactics, and that defendant's physical condition was not such that he could not understand or waive his rights.

Alvarez argued the statement to detectives was involuntary under the totality of the circumstances and should be excluded. He pointed to the fact defendant had recently been beaten and had suffered injuries, including to his head; his young age; his recent marijuana use; and his lack of sleep. With respect to defendant's statements to Thomas, Jaron, and Alicia, Alvarez acknowledged that statements to civilian witnesses are not analyzed "in the same prism" as statements to law enforcement. Because the statements were the result of a beating that resulted in physical injury, however, he argued they were involuntary and should be excluded.

The court concluded it would be an abuse of discretion to exclude defendant's statements to the civilian witnesses "at this point," as the determination of those witnesses' testimony and credibility was an issue for the jury. The court stated, however, that "upon timely objection to any particular question, the Court will rule as best it can ...." As to defendant's statement to detectives, the court found an implied waiver by defendant of his rights. The court found no coercion in the interrogation and, with respect to defendant's physical condition, noted that he declined medical treatment. Accordingly, the court ruled the statements were admissible.

**B. Analysis**

The due process clauses of the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 15 of the California Constitution, "preclude[ ] the admission of any involuntary statement obtained from a criminal suspect through state compulsion. [Citations.]" (*People v. DePriest* (2007) 42 Cal.4th 1, 34, 63 Cal.Rptr.3d 896, 163 P.3d 896; see *People v. Massie* (1998) 19 Cal.4th 550, 576, 79 Cal.Rptr.2d 816, 967 P.2d 29; *People v. Mickey* (1991) 54

---

[32] A recording of the interview, which was admitted into evidence, was played for the court.

[33] Defendant stated he "got jumped a little bit ago" by about 10 people, which was why he had a gash in his head and "got cut up some."

[34] Defendant refused medical treatment at the hospital, and the jail accepted him.

Cal.3d 612, 647, 286 Cal.Rptr. 801, 818 P.2d 84.)[35] Statements are involuntary "if they are the product of 'coercive police conduct.' [Citation.] We evaluate this question by looking to the totality of the circumstances to determine 'whether the defendant's " 'will has been overborne and his capacity for self-determination critically impaired' " ' by coercion.' [Citation.] The presence of police coercion is a necessary, but not always sufficient, element. [Citation.] We also consider other factors, such as the location of the interrogation, the interrogation's continuity, as well as the defendant's maturity, education, physical condition, and mental health. [Citation.]" (*People v. Caro, supra*, 7 Cal.5th at p. 492.)

"When a challenge is mounted, the prosecution must prove that a confession is voluntary by a preponderance of the evidence ...." (*People v. Benson* 1990) 52 Cal.3d 754, 779, 276 Cal.Rptr. 827, 802 P.2d 330.) "While the reviewing court independently decides whether the statements were involuntary, it accepts the trial court's factual findings if supported by substantial evidence." (*People v. DePriest, supra*, 42 Cal.4th at p. 35, 63 Cal.Rptr.3d 896, 163 P.3d 896.)

### 1. *Statements to civilians*

Defendant first says his statements to Jaron, Thomas, and the other civilians were involuntary. He says the group did not obey the statutory authority for making a citizen's arrest, delayed unnecessarily in delivering him to a peace officer, used unreasonable force and unlawful threats — including gang and death threats — to obtain admissions from him, and, since they were acting as agents of law enforcement, had a duty to give him a *Miranda* advisement.

The Attorney General says defendant forfeited his challenge regarding statements made to the group of civilians, because he failed to object when testimony concerning those statements was elicited by the prosecutor during trial. (See, e.g., *People v. Valdez* (2012) 55 Cal.4th 82, 142-143, 144 Cal.Rptr.3d 865, 281 P.3d 924.) Defendant responds by asserting there was no forfeiture based on the filing of a new decision allegedly supporting his position (presumably *People v. Saldana* (2018) 19 Cal.App.5th 432, 228 Cal.Rptr.3d 1), the fact he is raising a constitutional claim, this court's authority to consider the issue based upon its importance and because it might be repeated, and the ubiquitous contention of ineffective assistance of counsel.

Contrary to his apparent belief, the cases defendant cites as authority for these propositions do not require us to address any and all claims not raised at trial merely because a constitutional issue is raised or a new opinion has been decided while his appeal has been pending. Moreover, we will not address an ineffective assistance of counsel claim based on grounds that were omitted from the opening brief. (See *People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9, 167 Cal.Rptr.3d 615, 317 P.3d 1148.)

"A confession may be found involuntary if extracted by threats or violence ...." (*People v. McWhorter* (2009) 47 Cal.4th 318, 347, 97 Cal.Rptr.3d 412, 212 P.3d 692; see *People v. Benson, supra*, 52 Cal.3d at p. 778, 276 Cal.Rptr. 827, 802 P.2d 330.) "But a statement is voluntary unless there is 'coercive police activity.' [Citations.]" (*People v. Leonard* (2007) 40 Cal.4th 1370, 1403, 58 Cal.Rptr.3d 368, 157 P.3d 973.) In other words, some sort of state action is required.

---

[35] Statements obtained in violation of *Miranda* are inadmissible in the prosecution's case-in-chief, but may be used by the prosecution for impeachment purposes. Involuntary statements may not be used against a defendant for any purpose. (*People v. Caro* (2019) 7 Cal.5th 463, 492, 248 Cal.Rptr.3d 96, 442 P.3d 316.)

(*Colorado v. Connelly* (1986) 479 U.S. 157, 165, 107 S.Ct. 515, 93 L.Ed.2d 473.) Moreover, in order to render a confession involuntary, the coercive police conduct and the defendant's statement must be causally related. (*People v. Williams* (2010) 49 Cal.4th 405, 437, 111 Cal.Rptr.3d 589, 233 P.3d 1000.)

In the present case, defendant never contended at trial that Thomas and the others were acting as state agents. Accordingly, his claim of involuntariness with respect to the statements made to them has not been preserved for appeal. (See *People v. Mayfield* (1993) 5 Cal.4th 142, 172, 19 Cal.Rptr.2d 836, 852 P.2d 331.)[36] His statements to them were properly admitted pursuant to Evidence Code section 1220.

### 2. *Statements to law enforcement*

Defendant says that when Little took defendant into custody and returned him to the S. residence, where the civilians who had beaten defendant had congregated, it injected police coercion into the situation. Defendant also complains that Little never promised defendant effective police protection; left him in a patrol car, handcuffed and alone, at the S. residence; and, despite listening to the recording from Alicia's phone, never assured defendant the claim about law enforcement's involvement was not true.[37] Defendant also asserts that he was in custody, if not when under control of the civilians, then certainly when he was delivered to Little, and so he should have been given his *Miranda* warnings.

At trial, defendant failed to challenge Little's actions in relation to the voluntariness of his confession. He cannot do so now. (See *People v. Mayfield, supra*, 5 Cal.4th at p. 172, 19 Cal.Rptr.2d 836, 852 P.2d 331.)

Moreover, we reject any suggestion defendant's statements should have been excluded because Little failed to give defendant a *Miranda* advisement. As the

---

[36] Nor was there evidence to support a claim of state action. Based on the recording from Alicia's phone, defendant claims the police knew what the civilians were doing. The defense transcription of the recording appended to defendant's new trial motion as exhibit H depicts Alicia saying, "We told the cops that we got you before they did" and an unknown voice saying, "Now you're here. Now you're here. The cops were telling (inaudible) they told us to look for you." Another version, marked for identification as defense exhibit K, contained the same statement by Alicia, but had the unknown voice saying, "Now you're here, the cops are telling us that .... Told us (inaudible) now you're here buddy." Ignored by defendant is the fact that neither version nor the recording itself was ever admitted into evidence.

Defendant also points to the dispatch records, which, he says, "provid[e] more than a curious connection." In arguing for a new trial, Magill posited a phantasmagorical conspiracy theory that defendant was beaten at the direction of law enforcement, the plan may have been to have him be the subject of an assassination attempt, and deputies may have assisted in procuring a false confession by defendant because they had a financial interest in a 250-plant marijuana farm on the S. property. Like the recording from the phone, the dispatch records were an exhibit to the new trial motion and were never admitted into evidence.

Since there was no evidence the civilians were police agents, their "conduct in speaking to defendant could not render defendant's responses involuntary under the due process clauses of the federal or the state Constitution." (*People v. Mayfield* (1997) 14 Cal.4th 668, 759, 60 Cal.Rptr.2d 1, 928 P.2d 485, disapproved on another ground in *People v. Scott, supra*, 61 Cal.4th at p. 390, fn. 2, 188 Cal.Rptr.3d 328, 349 P.3d 1028.)

[37] In reality, the record does not establish Little realized there was such a statement. Little testified at trial that Alicia played the recording several times, but it was difficult to understand, particularly because Alicia was so excited. Little took possession of the cell phone and turned it over to Isaac.

Defendant claims that because nobody from the prosecution team ever took any action to distance law enforcement from the alleged statement on the recording that law enforcement knew what the civilians were doing, "the prosecution team made an adoptive admission that law enforcement knew and condoned the vigilantes' actions against [defendant]. (Evid. Code, § 1221.)" Defendant's claim is devoid of logical reasoning.

United States Supreme Court has made clear, "the special procedural safeguards outlined in *Miranda* are required not [when] a suspect is simply taken into custody, but rather [when] a suspect in custody is subjected to interrogation." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297.) "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." (*Id.* at p. 301, 100 S.Ct. 1682, fn.omitted.)

Here, the record shows Little merely asked if defendant was Spencer, how he was injured, if he wanted medical attention or an ambulance, and if the people who brought defendant to Little had injured him. This does not constitute "interrogation" within the meaning of *Miranda*. (See *People v. Davidson* (2013) 221 Cal.App.4th 966, 970, 164 Cal.Rptr.3d 798.) Thus, we need not determine whether defendant was merely detained or under arrest when he was in the patrol car (see *People v. Thomas* (2011) 51 Cal.4th 449, 477, 121 Cal.Rptr.3d 521, 247 P.3d 886), and we fail to see how Little's conduct constitutes evidence of coercion.

Defendant also faults Isaac for not offering him any promises of protection from the people who accosted him. He points to Alicia's statement on the phone recording that "every bulldog from here to Fresno County Jail is gonna know who he is before he even gets there."[38] He says the prosecution team knew or should have known the Bulldog gang was a criminal street gang and represented a very large portion of the general population in the Fresno County Jail. As support, defendant cites the trial testimony of a Fresno County Jail classification officer as summarized in *People v. Leon* (2016) 243 Cal.App.4th 1003, 1013, 197 Cal.Rptr.3d 600. The testimony of a witness in one case does not, absent circumstances not present here, constitute evidence in another, unrelated case.

Defendant also argues the threats were ongoing, in that he was threatened again when the note was left on the gate of his home the day before he was set to testify, and his father and uncle were shot at two days after the note was found. This does not show the requisite " 'coercive police activity' " (*People v. Leonard, supra*, 40 Cal.4th at p. 1403, 58 Cal.Rptr.3d 368, 157 P.3d 973) with regard to a confession made over a year earlier.

### 3. *The trial court's ruling*

Defendant claims the trial court erred in its ruling because "[a]fter all of the evidence had been introduced," the court acknowledged defendant had been harmed but praised Jaron and the other civilians, the court did not hold the prosecution to its burden of proof and production, in that no law enforcement agent promised defendant effective police protection, and defendant testified the threats were a factor in causing him to confess.

The ruling defendant contests occurred pretrial. The trial court statements and the testimony referenced by defendant occurred after the jury returned its verdicts. "Our review, of course, is limited to the evidence before the court when it heard the motion. [Citations.]" (*People v. Hartsch* (2010) 49 Cal.4th 472, 491, 110 Cal.Rptr.3d 673, 232 P.3d 663.)

---

[38] Again, this statement was neither in evidence nor before the trial court at the time it ruled on the voluntariness of defendant's confession.

That defendant may have been harmed does not automatically mean his confession was involuntary. He was not physically harmed or verbally threatened by any member of law enforcement, and nothing in the record of his interrogation by detectives suggests he was confused, worn down, or suffering significant discomfort, or that his will was overborne. (See, e.g., *Berghuis v. Thompkins* (2010) 560 U.S. 370, 386-387, 130 S.Ct. 2250, 176 L.Ed.2d 1098; *People v. DePriest, supra*, 42 Cal.4th at p. 35, 63 Cal.Rptr.3d 896, 163 P.3d 896; *People v. Perdomo* (2007) 147 Cal.App.4th 605, 617-619, 53 Cal.Rptr.3d 918; cf. *People v. Caro, supra*, 7 Cal.5th at p. 493.)

Defendant calls our attention to *People v. Berve* (1958) 51 Cal.2d 286, 332 P.2d 97 (*Berve*), overruled on another ground in *People v. Cahill* (1993) 5 Cal.4th 478, 509 and footnote 17, 20 Cal.Rptr.2d 582, 853 P.2d 1037. In *Berve*, the defendant was kidnapped at rifle point by the victim's husband. He was threatened with imminent death and forced to drive, with a rifle held to his head, to a strange house. There, other vengeful relatives of the victim were present. The defendant was continually told he must confess or die, and his parents were also threatened. While a rifle was pointed at him, the defendant was beaten with shoes, fists, and furniture for almost two hours. His head was pushed through a window, he was struck in the groin with the rifle butt, and he received many blows to the head. When a police officer arrived, he could see the defendant was bleeding, bruised, perspiring, and in a disheveled state, and he was aware the defendant had been brought to the house at gunpoint. The defendant was arrested, handcuffed, and taken to the police station, where he was questioned. He did not receive medical attention or have an opportunity to rest or wash himself. He was given only a single cup of water. During the interview, he was so confused that he showed complete temporal disorientation. He testified that he was in increasing pain during the interview, could not recall many of the questions and answers, and was in fear for himself and his parents from further attack by his assailants. He testified that he would have said " ' "yes" ' " to anything in order to be allowed to lie down and rest. (*Berve, supra*, at pp. 289-290, 332 P.2d 97.)

The California Supreme Court held that the prosecution failed to make the requisite showing "that such coercive conditions as once existed, no longer prevailed at the time the confession was uttered. [Citations.]" (*Berve, supra*, 51 Cal.2d at p. 291, 332 P.2d 97.) It observed: "The actual physical and psychological effects of the beating the defendant absorbed were painfully fresh when he confessed. The police made no effort to assuage his physical suffering by giving him medical attention, opportunity to rest, or even sufficient water to drink or to wash himself. Although there was no threat of further violence by the police, this element was provided by the clear threats of his kidnap[p]ers.... To say defendant's confession was freely and voluntarily given is to say that none of these elements extended from his physical ordeal to his police interrogation. It seems doubtful that the defendant would have readily confessed if he had been arrested before he had been mistreated by [the victim's husband] and his associates. [¶] ... The two-hour inquisition was to instill in defendant such a fear for his own safety and that of his parents that he would confess to proper authorities although removed from immediate danger. Thus, merely liberating the defendant could not wipe out the threats of violence ringing in his ears if he did not confess. The price exacted for freedom from further reprisals was a confession. Momentary police sanctuary could not still defendant's terror unless accompanied by promises of effective police protection. Only then can there be grounds for assuming that the defendant has freedom of choice." (*Id.* at p. 292, 332 P.2d 97.)

The state high court found "[n]o valid grounds for distinction ... in the fact that the coercion in this case was inflicted by civilians, and not the police. Decisions holding that confessions are inadmissible because they were rendered under conditions of threatened mob violence by civilians against an accused clearly imply such conclusion. [Citations.] The prohibition which bars the use of involuntary confessions is not only designed as a regulation of the conduct of police officers, but also to insure that an accused's right to a fair trial is protected. [Citation.]" (*Berve, supra*, 51 Cal.2d at p. 293, 332 P.2d 97.)

We find *Berve* factually distinguishable from the present case, both in terms of the quantity of physical and psychological harm inflicted on defendant by the civilians, and in terms of his subsequent treatment by law enforcement officers. Defendant showed no fear or confusion during the interview. We have little doubt defendant would have readily confessed even if he had been arrested before his encounter with Thomas and the others. (Compare *Berve, supra*, 51 Cal.2d at p. 292, 332 P.2d 97 with *People v. Salcido* (2008) 44 Cal.4th 93, 129-130, 79 Cal.Rptr.3d 54, 186 P.3d 437.)

Assuming defendant's statements to the civilians and/or confession to detectives should have been excluded, however, the error clearly was harmless beyond a reasonable doubt. (See *People v. Bradford* (1997) 15 Cal.4th 1229, 1313, 65 Cal.Rptr.2d 145, 939 P.2d 259 & cases cited; *People v. Perdomo, supra*, 147 Cal.App.4th at p. 619, 53 Cal.Rptr.3d 918.) The evidence presented at trial aside from defendant's confession (see *People v. Bradford* (2008) 169 Cal.App.4th 843, 855, 86 Cal.Rptr.3d 866) was uncontradicted that Y.G. was raped at knifepoint, did not know defendant, and defendant's DNA was found in semen in her vagina and her DNA was found on his penis and under his fingernails. His statements to the civilians and confession to detectives added nothing.

Scarber, 2019 WL 5958004, at *18–23 (footnotes in original).

1.  Statements Made to Civilians

The Due Process Clause of the Fourteenth Amendment requires confessions to be voluntary in order to be admitted into evidence. Dickerson v. United States, 530 U.S. 428, 433 (2000). The Supreme Court has held that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment," and stated that even the "most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause." Colorado v. Connelly, 479 U.S. 157, 167, 166 (1986).

"A private person cannot act unilaterally as an agent or instrument of the state; there must be some degree of governmental knowledge and acquiescence." United States v. Sherwin, 539 F.2d 1, 6 (9th Cir. 1976) (en banc) (holding that truck terminal manager was not acting as instrument of the government because there was no official involvement until after the terminal

1    manager had completed his search and called the FBI). "A mere purpose to assist the government

2    is not sufficient in and of itself to convert a private actor into a government actor." United States

3    v. Stevens, 601 F.2d 1075, 1080 (9th Cir. 1979) (holding that bank investigators were not de

4    facto government agents when promising immunity to secure defendant's cooperation because

5    federal authorities did not know or encourage the banks' investigatory activities). The Ninth

6    Circuit has held that a jailhouse informant was not a government agent when he obtained a

7    confession from a defendant because the informant acted on his own initiative and there was no

8    pre-existing agreement or *quid pro quo* between the informant and the government. United States

9    v. Pace, 833 F.2d 1307, 1313 (9th Cir. 1987).

10          Here, Petitioner "asserts that there existed 'some sort of "state action" to support a claim

11   of violation of the Due Process Clause of the Fourteenth Amendment.'" (ECF No. 3 at 35)

12   (quoting Connelly, 479 U.S. at 165).) In support of this argument, Petitioner directs the Court's

13   attention to "dispatch records providing more than a curious connection" and statements made by

14   the civilians that Petitioner claims indicate law enforcement knew what the civilians were doing.

15   (ECF No. 3 at 35.) In the pleadings before this Court, Petitioner does not further elaborate on the

16   "curious connection" that the dispatch records establish. On direct appeal, Petitioner argued that

17   "the dispatch records would have impeached Jaron and various law enforcement witnesses

18   concerning law enforcement's knowledge of the civilians' conduct toward defendant, which in

19   turn would be relevant to whether defendant's statements were voluntary." Scarber, 2019 WL

20   5958004, at *42.

21          In part, the dispatch records showed Brittany contacted the sheriff's department at
22   3:15 a.m. on July 30, 2011. According to the incident recall printout, she
     requested extra patrol coverage throughout the night, related to the earlier rape,
23   because she heard tapping on her bedroom window at some point but did not
     report it. At the hearing on the new trial motion, Magill argued this was "a
24   conspiracy call" that evidenced a conspiracy in place with Little and Larralde, and
     that the call advised the deputies that defendant had been beaten to the point he
25   was willing to confess and so they should come back and pick him up. Magill
     argued this would have permitted the defense to raise the issue of a conspiracy to
26   wrongfully convict defendant, and it would have challenged the credibility of both
     deputies concerning their reason for being there when defendant was delivered.
27   We note that at trial, Little testified he and Larralde had had another call "further
     up the road," and so were already in the area for a while when they started
28   focusing on the search for Y.G.'s cell phone.

37

1  Scarber, 2019 WL 5958004, at *42 n.60. On direct appeal, Petitioner also argued that the police

2  knew what the civilians were doing based on the recording form Alicia's phone. Id. at *20 n.37.

> The defense transcription of the recording appended to defendant's new trial
> motion as exhibit H depicts Alicia saying, "We told the cops that we got you
> before they did" and an unknown voice saying, "Now you're here. Now you're
> here. The cops were telling (inaudible) they told us to look for you." Another
> version, marked for identification as defense exhibit K, contained the same
> statement by Alicia, but had the unknown voice saying, "Now you're here, the
> cops are telling us that .... Told us (inaudible) now you're here buddy."

7  Scarber, 2019 WL 5958004, at *20 n.37.

8       The transcription of the recording from Alicia's phone reflects that there was some form

9  of communication between the civilians and law enforcement. Petitioner appears to argue that

10 the testimony of Deputy Little and Deputy Larralde regarding the timeline of what occurred on

11 July 30, 2011, is inconsistent with the dispatch records. However, statements indicating that the

12 civilians had communicated with law enforcement and dispatch records inconsistent with the

13 deputies' timeline testimony do not establish a degree of governmental knowledge and

14 acquiescence sufficient to convert the civilians to government agents. The Court is not aware of,

15 and Petitioner has not cited to, any United States Supreme Court authority holding to the

16 contrary.

17      Accordingly, the state court's determination that Petitioner's statements to civilians were

18 properly admitted was not contrary to, or an unreasonable application of, clearly established

19 federal law, nor was it based on an unreasonable determination of fact. The decision was not "so

20 lacking in justification that there was an error well understood and comprehended in existing law

21 beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Petitioner is not

22 entitled to habeas relief on this ground.

23      2.   Statements Made to Law Enforcement

24      The due process voluntariness test "examines 'whether a defendant's will was overborne'

25 by the circumstances surrounding the giving of a confession" and "takes into consideration 'the

26 totality of all the surrounding circumstances—both the characteristics of the accused and the

27 details of the interrogation.'" Dickerson, 530 U.S. at 434 (quoting Schneckloth v. Bustamonte,

28 412 U.S. 218, 226 (1973)). In sum, the voluntariness "determination 'depend[s] upon a weighing

of the circumstances of pressure against the power of resistance of the person confessing.'" Dickerson, 530 U.S. at 434 (quoting Stein v. New York, 346 U.S. 156, 185 (1953)). This Court "consider[s] the totality of the circumstances under a highly deferential standard to determine the reasonableness of the state court's conclusion that [Petitioner]'s statements [to law enforcement] were voluntary." Balbuena v. Sullivan, 980 F.3d 619, 633 (9th Cir. 2020), cert. denied sub nom. Balbuena v. Cates, 141 S. Ct. 2755 (2021). "The 'totality of the circumstances' test is a general standard requiring 'even greater deference under AEDPA.'" Balbuena, 980 F.3d at 633 (quoting Cook v. Kernan, 948 F.3d 952, 968 (9th Cir. 2020)).

The video recording of the interrogation supports the state court's determination that Petitioner "was not physically harmed or verbally threatened by any member of law enforcement, and nothing in the record of his interrogation by detectives suggests he was confused, worn down, or suffering significant discomfort, or that his will was overborne." Scarber, 2019 WL 5958004, at *22. See Doody v. Ryan, 649 F.3d 986, 1009 (9th Cir. 2011) (en banc) (stating that "[t]he audiotapes of [the petitioner's] interrogation are dispositive in this case, as we are not consigned to an evaluation of a cold record, or limited to reliance on the detectives' testimony"). There was nothing in Petitioner's demeanor during the interrogation indicating that any detrimental effects from his previous interaction with the civilians spilled over to his interrogation with law enforcement such that Petitioner's will was overborne.

Accordingly, the state court's determination that Petitioner's statements to law enforcement were properly admitted was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. at 103. Petitioner is not entitled to habeas relief on this ground.

3.   Harmlessness

"[T]he test for determining whether a constitutional error is harmless . . . is whether it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" Neder v. United States, 527 U.S. 1, 15 (1999) (quoting Chapman v. California, 386

1  U.S. 18, 24 (1967)). The Supreme Court has held that when a state court's "Chapman decision is

2  reviewed under AEDPA, 'a federal court may not award habeas relief under § 2254 unless *the*

3  *harmlessness determination itself* was unreasonable.'" Davis v. Ayala, 576 U.S. 257, 269 (2015)

4  (quoting Fry v. Pliler, 551 U.S. 112, 119 (2007)). Petitioner must show that the state court's

5  harmless error determination "was so lacking in justification that there was an error well

6  understood and comprehended in existing law beyond any possibility of fairminded

7  disagreement." Ayala, 576 U.S. at 269–70 (quoting Richter, 562 U.S. at 103). In other words,

8  "AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial[.]"

9  Brown v. Davenport, 142 S. Ct. 1510, 1525 (2022).

10      Here, the state appellate court's reasonable assessment of the evidence presented at trial

11  supports its conclusion that any erroneous admission of Petitioner's statements to civilians and

12  law enforcement resulted in no prejudice. Excluding Petitioner's challenged statements, the

13  uncontradicted evidence introduced at trial established the following: Y.G., who did not know

14  Petitioner, was raped by someone who had a knife. (3 RT[39] 484–91, 507, 510, 539–40, 544–52,

15  571–75, 582.) Petitioner's DNA was found in semen in Y.G.'s vagina, and Y.G.'s DNA was

16  found on Petitioner's penis and under his fingernails. (5 RT 977–83, 993–94, 996–97, 1001.)

17      The Court recognizes that a "confession is like no other evidence," Arizona v.

18  Fulminante, 499 U.S. 279, 296 (1991), and the "prejudice from [a] confession cannot be soft

19  pedaled," Anderson v. Terhune, 516 F.3d 781, 792 (9th Cir. 2008) (en banc). However, given the

20  weight of the other uncontradicted evidence introduced at trial, the state court's determination

21  that any erroneous admission of Petitioner's statements to civilians and law enforcement was

22  harmless beyond a reasonable doubt was not "so lacking in justification that there was an error

23  well understood and comprehended in existing law beyond any possibility for fairminded

24  disagreement." Richter, 562 U.S. at 103. Based on the foregoing, Petitioner is not entitled to

25  habeas relief on his second claim, and it should be denied.

26  ///

27  ///

28  ---
[39] "RT" refers to the Reporter's Transcript on Appeal lodged by Respondent. (ECF No. 18.)

1    **C.  Ineffective Assistance of Counsel**

2        In his third claim for relief, Petitioner asserts that trial counsel was ineffective for: (1)

3    failing to litigate the admissibility and failing to object to the admission of the two pictures of

4    knives; and (2) failing to effectively challenge the admission of Petitioner's statements to

5    civilians. (ECF No. 3 at 48–49.)

6        1.  *Strickland* Legal Standard

7        The clearly established federal law governing ineffective assistance of counsel claims is

8    Strickland v. Washington, 466 U.S. 668 (1984). In a petition for writ of habeas corpus alleging

9    ineffective assistance of counsel, the court must consider two factors. Strickland, 466 U.S. at

10   687. First, the petitioner must show that counsel's performance was deficient, requiring a

11   showing that counsel made errors so serious that he or she was not functioning as the "counsel"

12   guaranteed by the Sixth Amendment. Id. at 687. The petitioner must show that counsel's

13   representation fell below an objective standard of reasonableness and must identify counsel's

14   alleged acts or omissions that were not the result of reasonable professional judgment

15   considering the circumstances. Richter, 562 U.S. at 105 ("The question is whether an attorney's

16   representation amounted to incompetence under 'prevailing professional norms,' not whether it

17   deviated from best practices or most common custom." (citing Strickland, 466 U.S. at 690)).

18   Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong

19   presumption that counsel's conduct falls within the wide range of reasonable professional

20   assistance. Strickland, 466 U.S. at 687. A reviewing court should make every effort "to eliminate

21   the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

22   conduct, and to evaluate the conduct from counsel's perspective at that time." Id. at 689.

23       Second, the petitioner must show that there is a reasonable probability that, but for

24   counsel's unprofessional errors, the result would have been different. It is not enough "to show

25   that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466

26   U.S. at 693. "A reasonable probability is a probability sufficient to undermine confidence in the

27   outcome." Id. at 694. A court "asks whether it is 'reasonable likely' the result would have been

28   different. . . . The likelihood of a different result must be substantial, not just conceivable."

1   Richter, 562 U.S. at 111–12 (citing Strickland, 466 U.S. at 696, 693). A reviewing court may

2   review the prejudice prong first. See Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002).

3          When § 2254(d) applies, "[t]he pivotal question is whether the state court's application of

4   the Strickland standard was unreasonable. This is different from asking whether defense

5   counsel's performance fell below Strickland's standard." Richter, 562 U.S. at 101. Moreover,

6   because Strickland articulates "a general standard, a state court has even more latitude to

7   reasonably determine that a defendant has not satisfied that standard." Knowles v. Mirzayance,

8   556 U.S. 111, 123 (2009) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). "The

9   standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the two

10  apply in tandem, review is 'doubly' so." Richter, 562 U.S. at 105 (citations omitted). Thus, "for

11  claims of ineffective assistance of counsel . . . AEDPA review must be 'doubly deferential' in

12  order to afford 'both the state court and the defense attorney the benefit of the doubt.'" Woods v.

13  Donald, 575 U.S. 312, 316–17 (2015) (quoting Burt v. Titlow, 571 U.S. 12, 15 (2013)). When

14  this "doubly deferential" judicial review applies, "the question is not whether counsel's actions

15  were reasonable. The question is whether there is any reasonable argument that counsel satisfied

16  Strickland's deferential standard." Richter, 562 U.S. at 105.

17          2.  Pictures of Knives

18          Petitioner asserts that trial counsel was ineffective for failing to challenge the admission

19  of two pictures of knives. (ECF No. 3 at 48.) Respondent argues that this claim is unexhausted

20  because it was not raised in Petitioner's sole filing in the California Supreme Court but

21  nevertheless should be denied as meritless. (ECF No. 17 at 36.)

22              a.  Exhaustion

23          A petitioner in state custody who is proceeding with a petition for writ of habeas corpus

24  must exhaust state judicial remedies. 28 U.S.C. § 2254(b)(1). The exhaustion doctrine is based

25  on comity to the state court and gives the state court the initial opportunity to correct the state's

26  alleged constitutional deprivations. Coleman v. Thompson, 501 U.S. 722, 731 (1991); Rose v.

27  Lundy, 455 U.S. 509, 518 (1982). A petitioner can satisfy the exhaustion requirement by

28  providing the highest state court with a full and fair opportunity to consider each claim before

1  presenting it to the federal court. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); Duncan v.

2  Henry, 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971).

3        This claim was not raised in Petitioner's petition for review in the California Supreme

4  Court, (LD 11), and thus is unexhausted. However, pursuant to 28 U.S.C. § 2254(b)(2), the Court

5  may deny an unexhausted claim on the merits "when it is perfectly clear that the [petitioner] does

6  not raise even a colorable federal claim." Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005)

7  (adopting the standard set forth in Granberry v. Greer, 481 U.S. 129, 135 (1987)).

8                    **b.  Merits Analysis**

9        The defense theory, as articulated by trial counsel in closing argument, was that although

10  there was evidence of sexual assault, there were "little things . . . sloppiness . . . imprecision" that

11  "cannot, should not, be accepted . . . [in] a criminal trial where you have to prove every element

12  beyond a reasonable doubt." (6 RT 1155.) Defense counsel emphasized that the jury's job "is to

13  render a judgment, to look at things critically, to look at the details, to look at whether or not

14  something has been proven beyond a reasonable doubt," as opposed to "see[ing] a headline and

15  form[ing] an opinion," and argued that all those moments of sloppiness and imprecision in the

16  case, including "the not showing of the knife," "should make you go hmm. That should make

17  you pause. And I submit to you, ladies and gentlemen, if that does make you pause, then you

18  have a reasonable doubt. And if you have a reasonable doubt, then the proper verdict is not

19  guilty." (6 RT 1149, 1163.)

20        Defense counsel specifically discussed the picture of a knife during closing argument,

21  stating:

22        Additionally, you're shown a picture of a knife. The knife that was supposedly
           recovered from the Explorer. That knife was never shown to [Y.G.]. Never shown
23        to her. Never asked, hey, was this the knife that you saw late morning, early
           afternoon, of July 29th, 2011? Never shown to her. Again, curious. Should make
24        you think, you know, take a step back and go, why not?

25        . . . .

26        And, this is also pretty curious, when Detective Isaac testified, and when she was
           asked, you know, the knife that you recovered, did you show that to Spencer? She
27        couldn't recall. She testified she recalled showing the black T-shirt, but not the
           knife. No recollection of showing him the knife. . . .

28

                                        43

> And you saw the videotape. You know, she walked out of the room. And
> remember what she had said, "Oh, let me get the items we found in the backpack
> or what not." So she steps out of the room for a few minutes, she comes back in
> with nothing. Did not show Spencer, who they had right there, who was for all
> intents and purposes cooperating, did not show him the knife, did not show him
> those pair of sunglasses. Again, things that make you go hmm. Why not.

(6 RT 1148–49, 1150–51.) Later, trial counsel again questioned the validity of the picture of the knife, stating:

> We had testimony about, you know, the Explorer, the contents, you know, the
> bong, or whatever it was, the two-liter thing. You know, whether or not the items
> that were found in there, you know, again, the knife, the sunglasses, that we know
> from [Y.G.]'s account she says was used. But we don't know if those sunglasses
> or that knife that they actually recovered were there or were the ones that were
> used, because nobody verified it. Not with the Defendant. Not with Spencer.
> Certainly not with [Y.G.].

(6 RT 1152–53.)

Even assuming the picture was inadmissible, "[a]n attorney's failure to object to the admission of inadmissible evidence is not necessarily ineffective" because "under the circumstances, the challenged action might be considered sound trial strategy." Morris v. California, 966 F.2d 448, 456 (9th Cir. 1991) (internal quotation marks omitted) (quoting Strickland, 466 U.S. at 689). Here, as evidenced by closing argument, the picture of the knife was part of the defense narrative that the investigation of this case was sloppy and imprecise such that reasonable doubt was present. Moreover, Petitioner does not demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. The uncontradicted evidence introduced at trial established that Y.G. was raped by someone who had a knife. Petitioner's DNA was found in semen in Y.G.'s vagina, and Y.G.'s DNA was found on Petitioner's penis and under his fingernails. There is no reasonable likelihood that the result of Petitioner's trial would have been different even if trial counsel had successfully challenged the admission of the picture of the knife. As it is "perfectly clear" that Petitioner fails to raise a colorable federal claim, the Court may deny Petitioner's ineffective assistance of counsel claim for failure to challenge the admission of the pictures of knives on the merits pursuant to 28 U.S.C. § 2254(b)(2).

///

1         3.   <u>Petitioner's Statement to Civilians</u>

2       Petitioner asserts that trial counsel was ineffective for failing to challenge the admission

3 of Petitioner's statements to civilians, including failing to consult with any expert with regard to

4 coerced confessions, failing to call any witnesses on that subject, and failing to file any motions

5 to suppress. (ECF No. 3 at 48–49.) Respondent argues that the state court reasonably determined

6 that trial counsel effectively litigated admission of the statements to civilians. (ECF No. 17 at

7 29.)

8       This claim was raised on direct appeal to the California Court of Appeal, Fifth Appellate

9 District, which denied the claim in a reasoned opinion. The claim was also raised in the

10 California Supreme Court, which summarily denied Petitioner's petition for review. As federal

11 courts review the last reasoned state court opinion, the Court will "look through" the California

12 Supreme Court's summary denial and examine the decision of the California Court of Appeal.

13 <u>See</u> <u>Wilson</u>, 138 S. Ct at 1192.

14           **a.  Expert**

15       Petitioner asserts that trial counsel was ineffective because he "failed to consult any

16 expert with regard to coerced confessions." (ECF No. 3 at 48; ECF No. 20 at 18.) However, as

17 noted by Respondent in the answer and unaddressed by Petitioner in the traverse, trial counsel in

18 fact did consult and retain an expert on false confessions. <u>See</u> <u>Scarber</u>, 2019 WL 5958004, at

19 *38, 44. According to a declaration from trial counsel Alvarez, counsel discussed with the expert

20 "the possibility defendant falsely confessed due to being beaten and threatened by civilians. Due

21 to [the expert]'s findings, however, Alvarez decided not to call him as a witness." <u>Id.</u> at *38.

22       The Ninth Circuit has expressed skepticism that declining to call an expert, who had been

23 retained to consult, to testify during the penalty phase of a trial is constitutionally deficient.

24 <u>Floyd v. Filson</u>, 949 F.3d 1128, 1141 (9th Cir. 2020) ("The selection of an expert witness is a

25 paradigmatic example of the type of 'strategic choic[e]' that, when made 'after thorough

26 investigation of [the] law and facts,' is 'virtually unchallengeable.'" (citing <u>Hinton v. Alabama</u>,

27 571 U.S. 263, 275 (2014))). Here, Petitioner has not demonstrated how trial counsel's strategic

28 ///

1  decision not to call the expert as a witness due to the expert's findings[40] fell below an objective

2  standard of reasonableness.

### b.  More Witnesses

4          Petitioner asserts that trial counsel was ineffective because he failed to call any witnesses

5  regarding Petitioner's statements made to civilians. However, Petitioner does not specify which

6  witnesses should have been called. (ECF No. 3 at 48; ECF No. 20 at 18.)

7          On direct appeal, Petitioner raised an ineffective assistance of counsel claim, arguing that

8  trial counsel was ineffective for failing to call witnesses at the hearing on the voluntariness of

9  Petitioner's statements. In denying the claim, the California Court of Appeal stated:

> As previously described, an Evidence Code section 402 hearing was held with respect to the voluntariness of defendant's statements. Isaac testified for the prosecution, and the video recording of the interview was played for the court. No witnesses were called by the defense. Defendant now faults Alvarez for failing to call the two witnesses — Jaron and defendant — whose testimony Alvarez stated, in his declaration (exh. 1 to the People's opposition to defense motion for new trial), "was more than sufficient to establish *an argument* that the confession was coerced." (Italics added.)
>
> That Alvarez could have called Jaron and/or defendant at the hearing (see *People v. Pic'l* (1981) 114 Cal.App.3d 824, 864, 171 Cal.Rptr. 106, disapproved on another ground in *People v. Kimble* (1988) 44 Cal.3d 480, 496, fn. 12, 498, 244 Cal.Rptr. 148, 749 P.2d 803) does not mean he was ineffective for failing to do so (see *People v. Jennings, supra*, 53 Cal.3d at p. 379, 279 Cal.Rptr. 780, 807 P.2d 1009). Particularly in light of the video recording of defendant's statement to Isaac, Alvarez reasonably could have believed the trial court would find the statement voluntary regardless of such testimony, and so an argument of coercion would be better made to the jury without giving the prosecutor a preview of defendant's anticipated testimony. Because the record on appeal does not demonstrate there could have been no rational tactical reason for Alvarez's omission, defendant is not entitled to reversal. (See *People v. Lucas* (1995) 12 Cal.4th 415, 442, 12 Cal.4th 825A, 442, 48 Cal.Rptr.2d 525, 907 P.2d 373.)

22  Scarber, 2019 WL 5958004, at *54.

23          Petitioner also argued on direct appeal that the trial court erred in denying his motion for

24  new trial, which was brought on various grounds including ineffective assistance of trial counsel.

25  In finding that the trial court did not err in denying Petitioner's motion for new trial, the

26  California Court of Appeal stated in pertinent part:

---

27  [40] Petitioner has not disclosed the expert's findings or demonstrated that an expert would have testified favorably on his behalf. See Wildman v. Johnson, 261 F.3d 832, 839 (9th Cir. 2001) (holding that mere speculation an expert

28  would have testified on petitioner's behalf at trial is insufficient to establish prejudice).

In the course of its ruling on defendant's motion, the trial court stated:

> "In the efforts to claim ineffectiveness of Defendant's trial counsel, it must be borne in mind that trial counsel pursued the [Evidence Code section] 402 hearing regarding the voluntariness and admissibility of Defendant's confession.... [A]t the conclusion of that hearing, the Court found that the confession was freely and voluntarily made, and accordingly admissible at trial.

> "In addition to pursuing a[n Evidence Code section] 402 hearing regarding the confession, trial counsel also made a motion pursuant to Evidence Code Section 782. Defendant's trial brief also attempts to fault trial counsel for revealing contact with an expert, a Dr. Leo, in seeking an expert opinion with respect to the confession. [¶] ... [¶]

> "In our case trial counsel apparently consulted with an expert, and Defendant fails to show how that expert, or any expert, would have been able to provide favorable testimony. In that respect as well, Defendant has failed to show prejudice.

> "The claim that this was an abandonment of a defense is rejected. Rather, it shows an effort to mount a defense. And trial counsel cannot be faulted for that effort.

> "In fact, in all respects trial counsel's declaration ... is complete, persuasive, and dispositive regarding his preparation, strategy and tactics, all reflecting his effective assistance. In all respects Defendant has failed to show prejudice."

The trial court summarized the timeline of defendant's absence from trial and the proceedings that followed. It then stated:

> "What has been presented in support of this motion is totally bereft of any good cause or merit to grant the motion. The claim that Mr. Alvarez advised his client to lie is totally and completely rejected. Simply put, Mr. Alvarez did the very best he could with the little that he had to work with, namely, a voluntary confession and the DNA evidence. The conduct and actions of others, namely, [Thomas], [Jaron], and others, as forming a basis for this motion is nothing more than a distraction from the evidence of Defendant's guilt. [¶] ... [¶]

> "The Court recognizes that it is likely and probable that some of the Defendant's injuries reflected in the declarations were due in part to the assault at the hands of others. But that doesn't detract or derogate from Defendant's culpability for the crime.

> "As previously referenced, Mr. Alvarez did the very best he could considering the overwhelming evidence against his client. Mr. Alvarez'[s] declaration ... makes it abundantly clear that he tried this case as effectively as he could and provided sound legal advice and counsel as reflected in his declaration."

Defendant now contends the trial court erred in assessing Alvarez's performance for various reasons.

1    . . . .

2                        *Challenge to voluntariness of statements*

3        Defendant says Alvarez's performance was deficient in terms of how he
         challenged the prosecution's case regarding the voluntariness of defendant's
4        statements. He appears to suggest Scarber could have been called as a witness
         concerning defendant's health before and after his interaction with Alicia and the
5        others, and he accuses Alvarez of "unnecessarily rushing the case to trial" by not
         seeking a continuance when defendant vomited during jury selection.
6
         Scarber could not have explained away how defendant appeared in the video
7        recording of his statement to detectives. It is uncontradicted that defendant was
         responsive, coherent, and able to give a detailed account of what occurred. In
8        addition, Alvarez explained his tactics and reasoning in his declaration, including
         that defendant maintained his confession was coerced because of threats made
9        against him and his family. The trial court clearly found Alvarez to be credible,
         and we cannot say Alvarez's assessment of the issue was unreasonable.
10
         Defendant vomited during jury selection on December 5, 2012 (not December 4,
11       as stated in Scarber's declaration), two days after having knee surgery. At the
         time, Alvarez was conducting voir dire of a prospective juror in seat number
12       three. The prospective juror asked if defendant was ill or afraid. Alvarez
         responded that he was ill, but that he was not contagious, so nobody needed to be
13       concerned. We reject defendant's claim Alvarez's performance in this regard was
         somehow deficient.
14

15   Scarber, 2019 WL 5958004, at *44–47.

16       Petitioner has not shown that trial counsel's failure to call witnesses to testify at the 402

17   hearing[41] was an "error[] so serious that counsel was not functioning as the 'counsel' guaranteed

18   the defendant by the Sixth Amendment." Strickland, 466 U.S. at 687. As noted by the California

19   Court of Appeal, counsel reasonably could have concluded that the trial court would have found

20   Petitioner's statements admissible regardless of any additional testimony by Jaron and Petitioner,

21   and so an argument of coercion would be better made directly to the jury without giving the

22   prosecution a preview of Petitioner's anticipated testimony. Further, even if Petitioner's father

23   could have been called as a witness regarding Petitioner's health before and after his interaction

24   with the civilians, the California Court of Appeal reasonably found that the father could not have

25   explained away how Petitioner appeared responsive and coherent in the video recording of his

26   interrogation with law enforcement soon after his interaction with the civilians.

27   _____
     [41] "California Evidence Code section 402(b) permits a California trial court to 'hear and determine the question of
28   the admissibility of evidence out of the presence or hearing of the jury . . . .'" Sanders v. Cullen, 873 F.3d 778, 795
     (9th Cir. 2017).

                                                        48

### c. Motion to Suppress

Petitioner asserts that trial counsel was ineffective for failing to file any motions to suppress his statements to civilians. (ECF No. 3 at 48–49.) Although trial counsel did not file a written motion to suppress, counsel litigated the admissibility of Petitioner's statements to civilians at the 402 hearing. (3 RT 436–37.) Petitioner does not demonstrate how litigating admissibility at a pretrial hearing rather than filing a written motion fell below an objective standard of reasonableness or that there was a reasonable probability that the statements would have been suppressed if counsel had filed a written motion. See Johnson v. Norris, 537 F.3d 840, 847 (8th Cir. 2008) (holding state court rejection of ineffective assistance of counsel claim was not unreasonable application of Strickland where trial counsel did not file a written motion to suppress but was able to litigate the suppression issue at a pretrial hearing).

### d. Conclusion

Based on the foregoing, under AEDPA's "doubly deferential" review, Donald, 575 U.S. at 316, the Court finds that the state court's rejection of Petitioner's ineffective assistance claim regarding trial counsel's failure to effectively challenge the admission of Petitioner's statements to civilians was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based on an unreasonable determination of fact. The decision was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Richter, 562 U.S. at 103. Accordingly, Petitioner is not entitled to habeas relief for ineffective assistance of counsel on this ground.

## V.

## RECOMMENDATION

Based on the foregoing, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within **THIRTY (30) days** after service of the Findings and Recommendation, any party may file

written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and filed within fourteen (14) days after service of the objections. The assigned District Judge will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **October 6, 2022**

UNITED STATES MAGISTRATE JUDGE